## Case No. 13,156.

### SOCIETY FOR THE PROPAGATION OF THE GOSPEL v. WHEELER et al.

#### [2 Gall. 105.] [1]

Circuit Court, D. New Hampshire. Oct. Term. 1814.

WAR—ALIEN ENEMY—PARTY TO SUIT—IMPROVEMENTS—CONSTITUTIONAL LAW.

1. If a foreign corporation, established in a foreign country, sue in our courts, and war intervene between the countries, pending the suit, this is not sufficient to defeat the action, unless it appear on the record, that the plaintiffs are not within any of the exceptions, which enable an alien enemy to sue.

[Cited in Cochran v. Cunningham, 16. Ala. 448; March v. Eastern R. Co., 40 N. H. 453.]

2. Of the nature and effect of a plea of alien enemy.

[Cited in Taylor v. Carpenter, Case No. 13,-785.]

3. There is no legal difference as to the plea of alien enemy between a corporation and an individual.

[Cited in Adams v. Wiscasset Bank, 1 Greenl. 363; Wood v. Hartford Fire Ins. Co., 13 Conn. 212.]

4. The act of New Hampshire of the 19th of June, 1805 [Laws 1815, p. 170], allowing to tenants the value of improvements, &c. on recoveries against them, so far as it applies to past improvements, is unconstitutional.

See Withington v. Corey [2 N. H. 115].

[Cited in Foxcroft v Mallett, 4 How. (45 U. S.) 379; Tufts v. Tufts. Case No. 14,-233; Re Griffiths, Id. 5,825; Satterlee v. Matthewson, 2 Pet. (27 U. S.) 414; Sturges v. Carter, 114 U. S. 519. 5 Sup. Ct. 1,-017; Griswold v. Bragg, 48 Fed. 522.]

[See Albee v. Bundy, Case No. 134.]

[Cited in Briggs v. Hubbard, 19 Vt. 88; Clark v. Clark, 10 N. H. 387; Commissioners v. Rosche. 50 Ohio St. 111, 33 N. E. 408; Connecticut & P. R. Co. v. Town of St. Johnsbury, 59 Vt. 320. 10 Atl. 573; Dow v. Norris, 4 N. H. 19; Forster v. Forster. 129 Mass. 563. Cited in brief in Freeland v. Hastings. 10 Allen, 574. Cited in Girdner v. Stephens. 1 Heisk. 285, 286; Griffin v. McKenzie, 7 Ga. 163; Griswold v. Bragg. 48 Conn. 582. Cited in brief in Kennebec Purchase v. Laboree. 2 Greenl. 278. 289. Cited in Martindale v. Moore. 3 Blackf. 284; Mills v. Peirce. 2 N. H. 13. Cited in brief in Moon v. City of Ionia. 81 Mich. 636, 46 N. W. 25. Quoted in Newton v. Thornton, 8 N. M. 189, 5 Pac. 259. Cited in brief in Philadelphia v. Gray's Ferry Passenger R. Co.. 52 Pa. St. 179. Cited in Pickering v. Pickering, 19 N. H. 392. Cited in dissenting opinion in Rich v. Flanders, 39 N. H. 341. Cited in Shay's Appeal. 51 Conn. 167; Simpson v. City Sav. Bank, 56 N. H. 474. Cited in brief in Tilden v. Johnson. 52 Vt. 629. Cited in Willard v. Harvey. 24 N. H. 351; Withington v. Corey. 2 N. H. 118; Woart v. Winnick, 3 N. H. 478, 480.]

[5. Cited in Kent v. Rand. 64 N. H. 48. 5 Atl. 760, to the point that a mere moral obligation is not sufficient to support an express promise.]

[6. Cited in American Mut. Life Ins. Co. v. Owen, 15 Gray, 493, and in March v. Eastern R. Co., 40 N. H. 579, to the point that a foreign corporation may maintain a real action in the courts of this country.]

[7. Cited in Adams v. Hackett. 27 N. H. 294; City of Cincinnati v. Seasongood, 46 Ohio St.

───────

1 [Reported by John Gallison, Esq.]

303, 21 N. E. 630; Dunbarton v. Franklin, 19 N. H. 262; Leete v. State Bank of St. Louis, 115 Mo. 198, 21 S. W. 788; Opinion of the Justices, 41 N. H. 556; Rairden v. Holden. 15 Ohio St. 210; Rich v. Flanders, 39 N. H. 311; Wendell v. New Hampshire Bank, 9 N. H. 421; Willard v. Harvey, 24 N. H. 354; and in Pritchard v. Spencer, 2 Ind. 486,—to the point that a legislature may enact retrospective limitation laws where they do not deprive parties of a reasonable time for prosecuting their claims before being barred.]

[See Auld v. Butcher. 2 Kan. 150.]

Entry sur disseisin.—In the writ, the demandants, describing themselves as "the Society for the Propagation of the Gospel in Foreign Parts, a corporation duly constituted and established in England, in the dominions of the king of the United Kingdoms of Great Britain and Ireland, the members of which society are aliens and subjects of said king," demand of the tenants, who are all citizens of the state of New Hampshire, seisin of a tract of land in Westmoreland in said district of New Hampshire, which they aver to exceed in value the sum of five hundred dollars; and they count upon their own seisin, and a disseisin by the tenants, within thirty years. At the May term of this court, 1808, the tenants pleaded the following plea: "And the defendants come and say, that this court ought not to take cognizance of the said action, because they say, that said action is sued by and in the name of a supposed corporation or body politic, supposed to be created by a law of a foreign state, and is not sued and commenced by any citizen or subject of any foreign state, against them the said defendants, and this, &c. Wherefore they pray judgment, whether this court will take further cognizance of this action, and for their costs." The demandants replied as follows: "And the said society say that this court ought to take further cognizance of their action aforesaid; notwithstanding any thing by the said John Wheeler and others in their plea aforesaid alleged, because the said Society for the Propagation of the Gospel in Foreign Parts say, that at the time of the commencement of the said action, they were, and still are, a corporation constituted and established in England, in the dominions of the said king of the United Kingdoms of Great Britain and Ireland, and the members of said society then were, and still are, aliens, and subjects of the said king, as by their writ aforesaid is supposed, and this they pray may be inquired of by the country." To this replication there was a general demurrer, and joinder in demurrer.

The court having overruled the plea to the jurisdiction, the tenants, at the November term, 1810, pleaded the general issue, non disseisiverunt, which was joined by the demandants. At the May term, 1814, the tenants severally filed claims under the third section of the statute of New Hampshire of the 19th of June, 1805 (Laws N. H. Ed. 1815, p. 170), in which they alleged a seisin and possession of the demanded premises in themselves, or those, under whom they claimed, for more than six years before the commencement of the present action, and that by buildings and improvements the value of the land was increased in a certain sum, wherefore they prayed that the jury might, if they found a verdict for the demandants, inquire and ascertain the said increased value, and that no writ of seisin or possession should issue, until the demandants should pay into the hands of the clerk for the use of the tenants, such sum as the jury should so assess. At the October term, 1814, the jury found a verdict for the demandants, and they also found the value of the improvements made by the tenants severally. The demandants moved for a judgment on the verdict notwithstanding the statute, and the tenants moved in arrest of judgment, upon the ground, that the demandants appeared by the record to be alien enemies.

Mr. Freeman, for demandants, on the motion in arrest of judgment for alienage.

The demandants are entitled to judgment, unless their disability to sue appears on the record. The only ground of objection is contained in the description, which they give of themselves, for the purpose of giving jurisdiction to the court, viz. "The Society, &c. a corporation constituted in England, in the dominions of the king, &c. the members of which society are aliens and subjects of said king." If from this description, connected with other things of which the court are bound to take notice, it appears that the demandants cannot have ability to sue, judgment must be arrested; otherwise, they are entitled to it on the verdict.

Two grounds of disability may be pretended. (1) That it appears, by the demandants' own showing, that at the commencement of the suit they were aliens, and so could not sustain a real action. (2) That, since this action was brought, they have become alien enemies, and therefore disabled to sue any action.

As to the first ground, it is certain. that at the commencement of this action, British subjects, whether resident in this country or in the British dominions, might sue for, and recover, all lands, which they held previous to Jay's treaty, in the same manner as citizens, and this, whether disseised before or after the treaty. They are entitled to sue in the United States' courts, and the allegation of alienage in the writ is necessary to give the court jurisdiction. It does not, therefore, appear from the writ, whether the demandants were disabled to sue or not. And as to the merits of their claim, no new writ or other form of declaration is given them by the treaty, but the ordinary form of remedy for citizens. The count is simply on the seisin of the demandants, and disseisin by the tenants, in the same form, as though the suit were in the state court, where no such allegation is

necessary for the purpose of jurisdiction. The demandants are not bound to anticipate, nor can they anticipate or forestall the defence of the tenants, and the whole course of the pleadings, nor would it avail them, should they attempt it. But much less could they be bound in their declaration to anticipate a defence, which might arise after the action was commenced. If therefore by any possibility, the demandants might, consistently with this writ, reply sufficient matter to avoid the defence of alien enemy, if pleaded; the tenants were bound to plead it, and having answered to the merits, they must plead the new matter puis darrein continuance, else the disability is waived, and they are estopped to set it up afterwards. It is not denied, that the court ex officio must take notice of the declaration of war by congress, as indeed in England they must of the king's proclamation. No doubt, it is a public act. But, admitting all this, and that the members of the corporation, at the commencement of the suit, were and still are subjects of Great Britain, in such sense as is necessary to give this court jurisdiction, it does not necessarily follow, that they are alien enemies in such sense, as to disable them from sustaining this suit. In their corporate capacity, they have no such political relations, as to denominate them corporaliter a subject or an alien. Hope Ins. Co. v. Boardman, 5 Cranch [9 U. S.] 60. The disability then, if any, must result from the character of the individual members. But although alienage of the members of a corporation may be averred for the purpose of jurisdiction, it does not follow, that they can be considered as alien enemies, so as to destroy rights.

The plea of alien enemy cannot apply to a corporation aggregate, at all. If it could, it would follow, that a single stockholder of one of our banks residing in an enemy's country would disable the corporation to sustain any action in our courts. So is the law as to joint partners. McConnell v. Hector, 3 Bos. & P. 113. Co. Litt. 129a, is express, that alienage is no plea to an action, real or personal, by a corporation, because they sue in their corporate capacity and en autre droit. The same doctrine is laid down in Bacon's Abridgment, and applied to an alien enemy. And an alien enemy, for the same reason, viz. because he acts en autre droit, may sue as executor or administrator. 1 Bac. Abr. "Alien," D: "Abatement," B 3; 1 Salk. 46 pls. 1, 2; 1 Strange, 282; 1 Com. Dig. "Alien," C 7; Brocks v. Phillips, Cro. Eliz. 684; Caroon's Case, Cro. Car. 8; 3 Burrows, 1739, 1741; Wyngate v. Marke, Cro. Eliz. 275. Yet it might be a good plea, that the testator or intestate, at his decease, was an alien enemy. Skin. 370. From these authorities it would seem, that the law rather regards the person represented or the use than the party on the record. The law will protect the interest of an innocent assignee, or cestui que trust, in a chose in action. Winch v. Keeley, 1 Term R. 609; Brandon v. Nesbitt, 6 Term R. 23. On the principle of these cases, it would seem, that the assignee of a judgment, or other chose in action, would not be barred from suing in the name of a foreigner by the breaking out of war. In personal actions the thing is forfeited to the king, and after inquest he may have an action on the contract with an alien enemy for his own benefit. But not when the equitable property is in another. Nor can he have a writ on a disseisin done to an alien enemy, or other real action on his seisin. 1 Taunt. (Eng. Ed.) 29, 33. The reason of the law is, to prevent the property's being withdrawn from the country, and going to increase the resources of the enemy. It does not, therefore, apply to the case of lands, which cannot be withdrawn. Nor could it apply to a case of trust, where the proceeds of the suit must be applied to charitable and religious uses. There is nothing hostile in the purposes of this corporation. The government of the United States have not made war on the Christian religion. There is no case, in which the rule "cessante ratione cessat et ipsa lex" could apply more strongly. But, even in the case of individuals suing for their own benefit and in their own right, alienage for the purposes of jurisdiction, and the question of alien enemy to disable the party, are governed by very different rules. "Alienage" for the purpose of jurisdiction is opposed to "citizenship." Persons inhabiting here, not having political rights as citizens, are aliens, and may sue in the federal courts. Hollingsworth v. Duane, 4 Dall. [4 U. S.] 353. But on the question of alien enemy the domicil settles the character. It is uniformly so held in prize causes. La Virginie, 5 C. Rob. Adm. 98; O'Mealey v. Wilson, 1 Camp. 482. The matter alleged in the writ would clearly be insufficient in a plea of alien enemy, if any such plea might be allowed in the case. This plea requires the greatest strictness. The constant inclination of courts has been to narrow this ground of objection. It is a defence not favored in law. It is only temporary in its nature; it is considered as a dilatory plea; as being against right; and of all pleas the most odious. 8 Term R. 166, 71; 2 W. Bl. 1326; 13 East, 332; 10 East, 326; 1 Bos. & P. 165, 169, 170; 9 East, 321. Non constat, that in this case every member of the corporation is not now, and ever since the commencement of the war has been, commorant here. They sue in their corporate capacity, and en autre droit. They sue for their lands in a real action, to which case the plea of alien enemy has never been extended, and the reason of it does not apply. And so far as the court can determine from the name of the corporation, they sue for property as being devoted to a benevolent and pious use, not less beneficial to this country, than to any other, and wholly unconnected with any hostile or commercial purposes.[2]

---

[2] The reporter regrets, that not having been present at the argument on this point in behalf of the tenants, he is unable to insert it.

Mr. Freeman, on motion for judgment upon the verdict.

To the defendants' claim of compensation for their improvements, the plaintiffs object the 2d, 3d, 12th, 14th, and 23d articles of the bill of rights in the constitution of New Hampshire, article 1, § 10, of the constitution of the United States. and article 5 of the amendments. They contend: (1) That the statute relied on by the defendants (Act N. H. June 19, 1805; Laws 1815, p. 170), so far as it might be construed to affect this action, is void, being repugnant to the provisions of the constitution of New Hampshire above cited, as well as to the constitution of the United States. and to the principles of natural justice. (2) The act does not extend to suits in the United States' courts, nor bind those courts. (3) Nor to suits of foreigners; at least, of foreigners suing in the United States' courts. (4) The claims are insufficient, by reason of their uncertainty in respect to setting out the defendants' title. the persons of whom purchases were made. and the consideration.

I. The courts of the United States, not less than the state courts, must, when the question arises in a case properly before them, judge of the validity of an act of a state legislature, under the state constitution. Vanhorne's Lessee v. Dorrance, 2 Dall. [2 U. S.] 308; Cooper v. Tellfair, 4 Dall. [4 U. S.] 14; Ogden v. Blackledge. 2 Cranch [6 U. S.] 272, 276; New Jersey v. Wilson 7 Cranch. [11 U. S.] 164. The statute in question may be considered in two points of view: (1) As conferring a right on one party, and imposing a corresponding liability on the other; or, (2) as regulating a remedy, and prescribing the time and mode of proceeding.

From the verdict of the jury, by which the improved value is assessed, it appears that the demandants. at the time of passing the act, had. or would have a perfect right to recover the demanded premises. This was then an absolute and unconditional right to their remedy for the possession, clear of any incumbrance, "freely and without purchase." Till then there was no legal or equitable liability of the demandants to compensate for the increased value in case of a recovery. The law imputed no wrong, or fault, or laches, to the demandants for not suing within six years. It implied no contract in favor of an adverse possessor, who litigates a just title. It imposed no duty on the demandants. It gave no rights to the tenant. And so destitute even of moral obligation is the claim, that an express promise on such a consideration has been held to be nudum pactum and void. Frear v. Hardenbergh. 5 Johns. 272, 277. Such then being the rights of the parties, laying aside the constitutional objections, a statute must be very clear and unequivocal, to impair those rights on account of any facts or circumstances, which happened before the passing of the statute; for it is a general principle, that laws should be construed prospectively and not retrospectively, so as to take away a vested right. The case should not exist, at the passing of a law, upon which the law is to operate. The barring, defeating or impairing the recovery of a former right, by a statute, upon a consideration wholly past, is within the same general principle, and equally within the consideration of the constitution, as the creating of a new direct liability to an action. The principle of this statute would have been no worse, had it provided, that the tenant should have his action for such past improvement, in consideration of the prior purchase and possession, nor had it said, that such tenant then in possession, should hold the land absolutely forever. The right of recovery was before perfect and unconditional. Now, on the defendants' construction, it becomes, by the mere force of the statute, conditional, and charged with an incumbrance, for that, for which there was before no legal or equitable right. It is equally inadmissible to extend the statute to a case, where any part of the six years' possession was before the act passed. A statute of limitation is different; as it relates merely to prosecuting the remedy, and always contains an alternative of bringing suits within a certain time to run after the act passed. Here is no time allowed to bring a suit so as to avoid the charge of improvements, unless the act be wholly prospective. An action brought the next moment after the act was passed stands on the same ground in this respect, as one brought at any time within six years afterwards, for there can be no division of the time. It is repugnant to the very notion of a law, as defined by elementary writers, that it should be considered a rule for past cases. 1 Bl. Comm. 44–46; 1 Burlam. Nat. pp. 99, 101, 102, 104, c. 10, §§ 2, 3, 5, 6, 7; 2 Burlam. Nat. pt. 3, c. 1, §§ 2, 4; Puff. Laws Nat. bk. 1, c. 6, § 7; Id. bk. 7, c. 6, § 2; Bract. lib. 4, fol. 228; 2 Inst. 292; 7 Johns. 502, 504; Cod. l. 1, t. 14, l. 7. "Leges et constitutiones futuris certum est dare formam negotiis, non ad facta preterita revocari; nisi nominatim, et de preterito tempore, et adhuc pendentibus negotiis, cautum sit." A few authorities will show, that in analogous cases such construction of statutes, as that under which the defendants in this case claim, has been reprobated. as against natural justice. Grotius, J. B. & P. lib. 2, c. 10, §§ 1, 5; Id. lib. 3, c. 14, §§ 7, 8; Id. c. 20, §§ 7, 9, 10; 2 Vanhorne's Lessee v. Dorrance, 2 Dall. [2 U. S.] 304; Calder v. Bull, 3 Dall. [3 U. S.] 386; Ogden v. Blackledge, 2 Cranch [6 U. S.] 272, 276; Jackson v. Phelps, 3 Caines, 69; U. S. v. Heth. 3 Cranch [7 U. S.] 399, 403, etc.; 4 Johns. 75, 76, 78; 5 Johns. 139, 142; 4 Burrows, 2460; Dash v. Van Kleeck, 7 Johns. 477.

2. Considering the statute in the other view. viz. as regulating the remedy, and prescribing the time and mode of proceeding, the

same constitutional objections apply with equal force, and the defendants' construction of the act is doubly guarded against by those provisions, which relate to the protection of property, and the right of a free and certain remedy by law for all injuries.

II. But this statute, being directory only to courts, and prescribing a certain mode of proceeding, extends no further than the state courts, and does not bind those of the United States. The 34th section of the judiciary act (1 Stat. 74) passed September 24, 1789, does not extend to this case. There is a marked distinction between those statutes of the several states, which are to be considered as measures of right and rules of property, which congress has no authority to dispense with, and such as regard only the time, form and mode of pursuing remedies, and of process and proceedings in their courts. This distinction seems to be observed in the different statutes of the United States, which have reference to the state laws. Statutes of the first class only are embraced in the 34th section of the judiciary act. This provision recognizes the laws of the states for the time being, in cases where they apply, as rules of decision, &c.

On most questions, that arise in the trial of causes, the state laws must be the only rules of decision. Such are those concerning the attestation and effect of wills, course of descents, distribution of estates, modes of conveyances, contracts, and generally whatever regards the internal police and government of the state. Respecting such matters, congress has no legislative power, and it was probably for the removal of doubts upon this subject, and to prevent an extension of the powers of the general government by implication, and especially to allay those jealousies, which were assiduously fomented on its first adoption, that this section of the judiciary act was introduced. That this provision was not intended to extend at all to forms of process and proceedings in the federal courts, and those incidents generally, which it properly belonged to congress to regulate, is evident from the act to regulate process, which passed a few days afterwards, as well as from various other provisions of the statutes of the United States. The United States' government may establish their own limitation acts for proceedings in their courts, and, if they choose, make them uniform through the United States. A new state limitation act, as to the time of bringing suits, would not apply to suits in the United States' courts, unless expressly adopted by the general government. The limitation of penal suits is different under the United States' laws, and those of the states. In the United States, it is two years, in the state of New Hampshire but one. The limitation of writs of error in the United States' courts is also different from that in the state courts.

The courts of the United States are not governed by those statutes of the several states, which regulate costs, bail, process and trials, juries, challenges, &c. The words of the former statute regulating process, &c. (Act Sept. 29, 1789; 1 Laws [Folwell's Ed.] 146 [1 Stat. 93]) are "forms of writs, and process, and modes of proceeding in the courts of the United States shall conform to such, as are now used and allowed in the supreme courts in the respective states, &c." The existing statute regulating process (Act May 8, 1792; 2 Laws [Folwell's Ed.] 103 [1 Stat. 275]) adopts such form of writs, execution, and other process, and forms and modes of proceeding in common law suits, as were then used in the United States' courts in pursuance of the former act. The time and mode of remedy, &c. follow only such state statutes as were then in force, or else the common law. So in the statutes as to returning jurors (5 Laws [Folwell's Ed.] 195 [2 Stat. 82]) such mode, as then used, is adopted. There are also special provisions, as to writs of error, stay of execution, new trials, judgment on bonds with penalty, &c. See, also, section 15 of the judiciary act, and the provisions respecting prisoners for debt, 3 Laws [Folwell's Ed.] 335 [1 Stat. 482]; 5 Laws [Folwell's Ed.] 6 [2 Stat. 4]. The form of remedy and course of judicial proceedings, and the time when the action may be commenced, follow not the lex loci contractus, nor the law of the place where the right or liability accrues, but that of the jurisdiction where the remedy is prosecuted. Pearsall v. Dwight, 2 Mass. 84. This distinction as to the objects of the state laws, which goes to exclude the case in question from the purview of the 34th section of the judiciary act, appears to have been insisted on with effect in the trial of Judge Chase. Evans' Trial of Judge Chase, Append. pp. 4, 5. arts. 5, 6; Answers, p. 31, etc.; Randolph's Reply, art. 5; Harper's Opening, p. 59; Clarke, 115; C. Lee, 164, p. 268, and Append. 62, the vote.

III. As to the application of the law to foreigners, it is to be observed, that whatever the state sovereignty may direct respecting its own subjects, yet in cases where the rights of foreigners are concerned, the law of nature and of nations is paramount to the municipal or common law, or rather may form exceptions and restrictions to general rules. The law of nations in its full extent, where applicable, is part of the common law of every country. 3 Burrows, 1480; 4 Burrows, 2016. It may justly be questioned, whether any one of the state sovereignties has authority to divest foreigners of their rights, or destroy their remedies, as is attempted in this case. A regulation respecting remedies, and proceedings in the state courts, where citizens only are bound to sue, might, from the different organization of the federal courts, and the course of their proceedings, and the different situation of their suitors, operate very unequally, if applied to them. For example, a very short term of

limitation for bringing suits, as in this case for paying betterments, might defeat the rights of foreigners altogether, without any laches on their part. The federal judiciary was intended to protect the rights of strangers against local and state partiality and injustice.

IV. As to the fourth point, on the sufficiency of the defendants' claims, I shall submit it to the court, if they should come to it.

Mr. Richardson, for tenants, on the motion for judgment upon the verdict.

It is not denied, that the legislative power is limited by the constitution, nor that the court have a right to declare an act, which is contrary to the constitution, void. But in the first place it is denied, that any right secured by the 2d, 3d, or 12th articles of the New Hampshire bill of rights, or by the 5th article of the amendments of the constitution of the United States, is violated by this act.

What are the facts? The defendants, supposing they had acquired a legal title to the land, having paid a valuable consideration for it, entered, and at great expense and labor increased the value of the land, by buildings and improvements made thereon. To whom do these improvements and buildings belong? Every man has a right to the fruits of his own labor. By this rule the buildings and improvements belong to the defendants. How do the plaintiffs derive their right to them? They own the lands; these improvements cannot be severed from the land; they can recover the lands and these improvements as incident to them. But this course of reasoning shows not a vested right to the improvements, but the mode in which a vested right may be acquired. When the plaintiffs shall have recovered the land, they will then, and not before, have a vested right in the improvements. This distinction is clearly recognised in the case of Taylor v. Townsend. 8 Mass. 411. It is not true, that whatever is annexed to the freehold becomes immediately the property of the owner of the land, as is evident from the right of a lessee to remove certain buildings by him erected. Bull. N. P. 34. There is, in principle, no distinction between improvements, that can be severed and removed from the land, and those which cannot. The man, who turns unproductive low land into productive meadow, is, in equity and justice, as much entitled to the increased value, as he who erects a building, is entitled to that building, although, as the law stood before this act, the one had no remedy to enforce his right, and the other had a remedy in certain cases. The design of the law, against which the plaintiffs object, was to provide a remedy, where none existed before. It is founded upon the supposition, that the tenant has a vested right to the improvements, he has made, as the fruit of his own labor, and that the owner of the land has no right to them. If the broad principle be assumed as true, that whatever improvements are made upon land become immediately the property of the owner of the land, by a vested right, whether he is in possession or not, the doctrine laid down in Bull. N. P. 34, and the principles of the case of Taylor v. Townsend, would be a violation of the constitution of New Hampshire; and yet both cases are understood to be law here. What right of the plaintiffs is violated? Before this act they had a right to the land; they had a right to a remedy, to recover the land with all the improvements. These rights they still retain. The legislature, in this act, say, you may have your land, you may have your remedy to recover it, but you shall not acquire a right to the improvements made upon it by an innocent tenant, through a mistake of his rights, till you have paid him for those improvements. You shall not turn him out of possession, and enjoy the fruits of his labors, till you make him a compensation. If this be a violation of an essential natural right, it is apprehended that by the same course of reasoning it may be shown, that the maxim in equity, "you shall do justice before you receive it," is inequitable. There is no novelty in making a distinction between the value of the land at any particular time, and the improvements afterwards made upon it, as appears from the opinion of C. J. Kent, in Pitcher v. Livingston, 4 Johns. 17.

With regard to the objection, that this act violates the first article of the bill of rights, the defendants apprehend, that the history of that article shows that it was not intended to apply to a case of this kind. The clause of that article, on which the plaintiffs rely, has always been understood to have been copied from the "nulli vendemus justitiam" magna charta, which was certainly intended to apply to a very different case. Sull. Lect. 272. But it is said. this law, as applied to this case, is a retrospective law for the decision of a civil cause. Before discussing this question, it seems necessary to ascertain, what is a retrospective law within the meaning of this article in the bill of rights. It is apprehended, that the opinions expressed by the court in Calder v. Bull, 3 Dall. [3 U. S.] 386, and Dash v. Van Kleeck, 7 Johns. 477, authorize the definition, that a retrospective law is one, that takes away or impairs rights acquired by existing laws. It is believed, no other definition can be found.

Now it is denied that this act, applied to this case, takes away or impairs any vested right. It is denied, on the grounds before stated, that the plaintiffs ever had any vested right to the improvements made by the defendants upon the land. Under the law, as it stood before this act. they might have acquired such a right, but they never did acquire it, and the statute only declares, they shall not now acquire it without making compensation. The statute secures to the defendant a vested right, which justice requires should be secured

to him. The case cited from 5 Johns. 272, does not apply to this case. There the tenant went upon the land, knowing it to belong to another. In this case, the tenants entered innocently and by mistake, and it is humbly submitted, that unless the plaintiffs had a vested right to acquire property from the defendants against justice and equity, there is no foundation for this objection. The other objections made by the plaintiffs' counsel require no answer.

Mr. Freeman, in reply.

The facts assumed by the defendants' counsel, viz. "that they, supposing they had acquired a legal title to the land, having paid a valuable consideration, entered, and at great expense and labor increased the value of the land by buildings and improvements," are not warranted by the defendants' claim, nor by the case provided for by the statute. It was not necessary, in order to make out the case according to the statute, for the defendants to show, nor does it at all appear, that the improvements or any considerable part of them, were made by the defendants themselves, or by any person, who held under a bona fide purchase, or any color of title. But the broad rule, "that every man has a right to the fruits of his own labor," would apply equally well to any case, where a stranger should undertake to manage my affairs without my consent. It never can be contended, that a mere wrong doer, entering wilfully and knowingly on another's land without his consent, without color of title, and retaining the possession, acquires any right merely by bestowing his labor upon it. But the rule laid down by the defendants' counsel must be maintained in all this extent, in order to prove the defendants' right to the benefit of improvements before the act passed. For it does not appear that the improvements were not wholly made by the original wrong doer, long before any purchase. He, after six years, could have no claim under the statute for compensation, and yet, by his sale, the defendants, it is said, have become entitled to that compensation. And still, as the defendants' cases show, the purchaser, on eviction, might recover on his warranty the full value at least of the land and improvements, as they were when conveyed to him; so that, in the event, the original wrong doer would have the benefit of the improvements, or else the purchaser would have a double satisfaction. But put the case, as the defendants' counsel, without any ground, supposes it, that the improvements must have been made by the bona fide purchaser, still he had no right to compensation before the statute. Such right, at any rate, could be considered as no better than the imperfect one, that a man may have to the charity or generosity of others. It stands on hardly so good a foundation as a mere debt of gratitude. Can the legislature enforce the discharge of such previous obligations? It is believed they cannot.

Rights of property, as enforced in courts, must not depend on any vague and imaginary notions of natural justice, but on the settled rules of law. These are the great landmarks, which limit the rights of parties, and they must be observed. They settle the questions, What is right? and, What is just? And on this subject, the rule in law and in equity is the same, "Equitas sequitur legem." It is said, that the statute is founded on a supposition, that the tenant has a vested right to the improvements he has made, and that the object of the law was, to provide a remedy where, it is conceded, none existed before. But it is a maxim of law, that for every right there is a remedy. Want of right and want of remedy are convertible terms. If any such right existed, there seems to be no difficulty in adapting the existing forms of common law remedies to it. The case in 5 Johns. 272, did not turn on any question as to the form of remedy. The cases of warranty, &c. have no bearing in favor of the defendants. They respect only the construction and effect of contracts as between the parties and privies. The cases cited of buildings, which may be severed and taken away by the lessee during the term, are also inapplicable, and they do not warrant the doctrine inferred from them, "that whatever is annexed to the freehold does not become the property of the owner of the land." The principle of these cases I apprehend to be, that the things never were annexed to the freehold, or if they had been so annexed, yet they were severed from the freehold or inheritance by the contract of the parties, express or implied, and common usage may be evidence of such contract. The cases of lessees, however, might not be quite so inapplicable, if it could be shown, that they had a right to compel their landlords to pay for the coppers, buildings, and ameliorations of the soil, by them put up and made on the land, when not stipulated for in the lease.

Every principle of the common law is repugnant to the notion of any such right of the defendants to compensation for their improvements, antecedent to the statute. The improvements themselves, in most cases arising under the statute, are such as would be considered waste by the common law, and if made by the tenant of a rightful particular estate, would subject him to forfeit it. Co. Litt. § 67. This notion is repugnant to the law in relation to personal property, in the cases of accession and confusion of goods, as laid down, 2 Bl. Comm. 404, etc. And Bracton in the place there cited, as well as Co. Litt., applies the rule of accession more strongly to real estate. It is impossible to conceive what is meant by a "vested right to land," and "a vested right to a remedy to recover the land with all the improvements," and a vested right, at the same time, in the improvements in an adverse possessor. Permit me to have the effect of my vested rights to the land, and to the remedy to recover the land, as it is, with the improvements, and also to keep my money in my own possession, to which I suppose I have also a

vested right, and my adversary may enjoy such vested right in the improvements as he can.

2. The 14th article of the bill of rights secures a remedy for every right of property, as absolutely as the right itself is secured. It is immaterial to the party pursuing his rights, whether he is obliged to pay the purchase money to the government, or to the adverse party.

3. If it be true that, in law, the defendants had no vested right to compensation for improvements before the act passed, then it seems to be conceded, that the constitutional objections, both on the articles protecting the rights of property, and on the article prohibiting retrospective laws, are well grounded. But it is doubtful, at least, whether the defendants' definition of a retrospective law is so perfect, as to comprehend all civil cases, that come within the 23d article. Any law subjecting a person to loss or detriment, or imposing an obligation on him on a past consideration, or made to apply to existing cases, is retrospective. A law enhancing the measure of damages in civil actions on past cases is equally prohibited by this article, as a law that enhances the punishment of a crime already committed. There can be no doubt, that such a law is retrospective, and it makes the case no clearer to compare it with the definition of the defendants' counsel. No vested right is impaired, in the case put, more than there is by the statute now in question. In one case the party's money is recovered, from him, on a past consideration, in the form of damages. In the present case, he would be compelled by the statute, on such past consideration, to part with his money, or else lose his land, and either alternative is equally exceptionable.

STORY, Circuit Justice. This is a writ of entry sur disseisin, brought on the demandants' own seisin, and a disseisin by the tenants within thirty years; the writ bears teste on the 22d December, 1807. The tenants, at May term, 1808, having pleaded a plea to the jurisdiction, which was overruled by the court, afterwards pleaded the general issue nul disseisin; and at the present October term of this court, a verdict was found for the demandants; and also the value of the improvements made by the tenants on the demanded premises, pursuant to the statute of New Hampshire of the 19th of June, 1805. Acts 1805, p. 395; Acts 1815, p. 170. After the verdict, a motion was made by the demandants for a judgment on the verdict, at common law, and writ of seisin thereon, without any regard whatever to the provisions of the statute of 1805, or the value of the improvements found by the verdict, principally upon the ground that this statute was unconstitutional. A cross motion was also made by the tenants in arrest of judgment, upon the ground that the demandants were, by their own showing, alien enemies, and therefore not entitled further to pursue the present action.

These motions have been ably argued, and the decision, which after much deliberation I have formed, will now be pronounced.

And first, as to the motion in arrest of judgment. The demandants are described in the writ, as "The Society for the Propagation of the Gospel in Foreign Parts, a corporation duly constituted and established in England, in the dominions of the king of the United Kingdoms of Great Britain and Ireland, the members of which society are aliens and subjects of the said king." If from this description, and the other facts apparent upon the record, the court must intend, that the demandants have not a capacity further to pursue the present action, then the motion must prevail. If, on the other hand, by possibility, and consistently with the facts on the record, such capacity can remain, then judgment must pass upon the verdict for the demandants. There is no pretence for holding, that the mere alienage of the demandants would form a valid bar to the recovery in this case, supposing the two countries to be at peace; for however true it may be, in general, that an alien cannot maintain a real action, it is very clear that either upon the ground of the 9th article of the British treaty of 1794, or upon the more general ground, that the division of an empire works no forfeiture of rights previously acquired, (and in point of fact the title of the demandants was acquired before the American Revolution) for aught that appears upon the present record, the present action might well be maintained. Kelly v. Harrison, 2 Johns. Cas. 29; Jackson v. Lunn, 3 Johns. Cas. 109. The whole objection therefore must rest on the existing war.

The defence of alien enemy is by no means favored in the law (see Steph. Pl., Ed. 1824, p. 67); and some modern cases have gone a great way in discountenancing it; further, indeed, than seems consistent with the general rules of pleading. In Casseres v. Bell, 8 Term R. 166, the court held, that the plea of alien enemy must not only aver such hostile character, but also set forth every fact that negatives the plaintiff's right to sue; and this decision is expressly put upon the mere ground of authority. On a careful examination, however, of the cases cited, it will not be found that they support the doctrine. In Derrier v. Arnaud, 4 Mod. 405, the original record of which, Lord Kenyon says, had been examined, the plea negatived every presumption that could arise in favor of the plaintiff's right to sue. But the case did not turn at all upon that point, but simply on the question, whether oriundus, in the plea, was equivalent to natus, and upon examining precedents, the court held the plea good; and, as no such objection was made, it seems difficult to admit, that a mere averment of the additional facts was adjudged necessary, when upon the judgment of the court it stands purely indifferent. In Openheimer v. Levy, 2 Strange, 1082, to an action of assumpsit the defendant pleaded, alien nee, without saying alien ene-

my, and the court held, that, as an alien friend may maintain a personal action, and in order to abate the writ, the plaintiff should be shown to be an alien enemy, which is not to be presumed, nor the contrary necessary to be replied, therefore the plea was bad; and so the law had before that time been held. Dyer, 2. The case, therefore, steers wide of the doctrine contended for. In Wells v. Williams, 1 Ld. Raym. 282, Lutw. 34, and Salk. 46; to debt upon a bond by an executor, the defendant pleaded, that the plaintiff was an alien enemy, and came into England without a safe conduct. The plaintiff replied, that at the time of making the bond he was, and yet is, in England, by the license, and under the protection of the king; and upon demurrer the court held, not that the plea was bad, but that the replication was good; and the court resolved, that if the defendant came there before the war, there was no need of a safe conduct; and if he came since the war, and continued without molestation, it should be intended that he came by a license, and his right to sue was consequent upon his protection. In this case, also, the objection did not arise; for the only question seemed to be, whether a residence by the license, and under the protection of the king, would entitle the party to sue without having a safe conduct; and the court held that it would. And this is but an affirmance of the doctrine of the year books. 32 Hen. VI. p. 23b. These are all the authorities, upon which Casseres v. Bell professes to have been decided. On the other hand, in Sylvester's Case, 7 Mod. 150, which was not cited, where the plea was alien enemy, or demurrer, the court held it good; and that, if the party were entitled under a general or special protection of the king, he ought to reply that fact. And so were the pleadings in George v. Powell, Fortes. 221. And there are several other precedents, in which the plea does not negative the facts, which might enable an alien enemy to sue. 9 Edw. IV. p. 7; Cro. Eliz. 142. If, therefore, the present question turned at all upon Casseres v. Bell, which was cited at the argument, it would require a good deal of consideration, before that decision could be maintained. The case of Clarke v. Morey, 10 Johns. 69, pushes the doctrine further, and asserts that an alien enemy, who comes and resides here without a safe conduct or license from the government, (for so is the averment in the plea) is at all events entitled to sue, until ordered away by the president; and this too, although the party is not known by the government to have his residence here. The English authorities have always required an express safe conduct or an implied license; and Boulton v. Dobree, 2 Camp. 163, decides, that a license is not to be implied from mere residence, unless sanctioned by the government after the commencement of hostilities. The present case, however, may well rest upon distinct grounds; for whether the facts should, in pleading, come from one party or the other, to bring the plaintiff within, or to take the plaintiff out of, the disability of alien enemy: it is very clear, that every fact must appear on the record, which negatives his right to sue; otherwise the judgment cannot be arrested.

The objections to the rendition of judgment for the demandants, in the case at bar, seem to be two; first, that the corporation itself, being established in the enemy's country, acquires the enemy's character from its domicil: second, that the members of the corporation are subjects of the enemy, and therefore personally affected with the disability of hostile alienage. It is certainly true, that as to individuals, their right to sue in the courts of a belligerent, or to hold or enforce civil rights, depends not on their birth and native allegiance, but on the character, which they hold at the time when these rights are sought to be enforced. A neutral, or a citizen of the United States, who is domiciled in the enemy's country, not only in respect to his property, but also as to his capacity to sue, is deemed as much an alien enemy, as a person actually born under the allegiance and residing within the dominions of the hostile nation. This, indeed, has long been settled as the general law of nations, and enforced in the tribunals of prize; and has been latterly recognised and confirmed in the municipal courts of other nations. O'Mealey v. Wilson, 1 Camp. 482; McConnell v. Hector, 3 Bos. & P. 113. And the same principle has been applied to a house of trade established in a hostile country, although the parties might happen to have a neutral domicil; the property of the house being, for such purpose, considered as affected with the hostile character of the country, in which it is employed. The Vigilantia, and the cases therein cited, 1 C. Rob. Adm. 1; The San Jose Indiano [Case No. 12,322].

In this respect, a corporation, authorized by its charter, to carry on a trade, and established in the hostile country, such as the East India Company, would undoubtedly be held, as to its property, within the same rule, even admitting its members possessed a neutral domicil. In general, an aggregate corporation is not in law deemed to have any commorancy, although the corporators have (Inhabitants of Lincoln Co. v. Prince, 2 Mass. 544); yet there are exceptions to this principle; and where a corporation is established in a foreign country, by a foreign government, it is undoubtedly an alien corporation, be its members who they may; and if the country become hostile, it may, for some purposes at least, be clothed with the same character. Even in respect to mere municipal rights and duties, an aggregate corporation has been deemed to have a local residence. It has been held to be an "inhabitant" under the statute for the reparation of bridges (22 Hen. VIII. c. 5; 2 Inst. 697, 703); and an "inhabitant and

occupier" liable to pay poor rates, under the statute, 43 Eliz. c. 2. Rex v. Gardner, Cowp. 83. It may therefore acquire rights, and be subject to disabilities, arising from the country, if I may so express myself, of its domicil. And, indeed, upon principle or authority, it seems to me difficult to maintain, that an aggregate corporation, as for instance an insurance company, a bank, or a privateering company, established in the enemy's country, could, merely from its being an invisible, intangible thing, a mere incorporeal and legal entirety, be entitled to maintain actions, to enforce rights, acquire property or redress wrongs, when its own property on the ocean would be good prize of war. If the reason of the rule of the disability of an alien enemy be, as is sometimes supposed, that the party may not recover effects, which, by being carried hence, may enrich his country, that reason applies as well to the case of a corporation, as of an individual, in the hostile country. If the reason be, as Lord Chief Justice Eyre in Sparenburgh v. Bannatyne, 1 Bos. & P. 163, asserts it to be, that a man professing himself hostile to our country, and in a state of war with it, cannot be heard, if he sue for the benefit and protection of our laws, in the courts of our country, that reason is not less significant in the case of a foreign corporation, than of a foreign individual, taking advantage of the protection, resources and benefits, of the enemy's country. In point of law, they stand upon the same footing. It has been argued, that the court will look to the purposes, for which the corporation was instituted, and to the conduct, which it observes; if these be innocent or meritorious, they afford an exception from the general rule. But it is not the private character or conduct of an individual, which gives him the hostile or neutral character. It is the character of the nation, to which he belongs and where he resides. He may be retired from all business, devoted to mere spiritual affairs, or engaged in works of charity, religion and humanity, and yet his domicil will prevail over the innocence and purity of his life. Nay more, he may disapprove of the war, and endeavor by all lawful means to assuage or extinguish it, and yet, while he continues in the country, he is known but as an enemy. The same principle must apply, in the same manner, to a corporation. The objects, indeed, of the present corporation are highly meritorious and worthy of public favor; but, upon the doctrines of law, it must be deemed a British alien corporation, and as such liable to the imputation of being an enemy's corporation, unless it can be protected upon other principles.

Let us now advert to the second objection, which is, that the members of the corporation are all alien enemies. In the writ, it is expressly alleged, that all the members are aliens and subjects of the king of the United Kingdom of Great Britain and Ireland. It does not however hence necessarily follow, that they are alien enemies. This averment in the writ was proper, if not indeed indispensable, in order to sustain the jurisdiction of this court; for the corporation, as such, might perhaps have no authority whatsoever to maintain an action here, under the limited jurisdiction confided by the constitution of the United States to their own courts. But in the character of its members, as aliens, we have incontestable authority to enforce the corporate rights; and it has been solemnly settled by the supreme court, that for this purpose the court will go behind the corporate name, and see who are the parties really interested. Bank of U. S. v. Deveaux, 5 Cranch [9 U. S.] 61. And if, for this purpose, the court will ascertain who the corporators are, it seems to follow, that the character of the corporators may be averred, not only to sustain, but also to bar, an action brought in the name of the corporation. It might therefore have been pleaded in this case, even if the corporation had been established in a neutral country, that all its members were alien enemies; and upon such a plea, with proper averments, it would have deserved great consideration, whether it was not, pendente bello, an effectual bar. Where the corporation is established in the enemy's country, the plea would a fortiori apply.

But, although the corporation itself, and the members also, may be liable to the imputation of being alien enemies; yet that character does not necessarily or unavoidably attach to either. For aught that appears upon the face of the record, every member of the corporation may be now domiciled in the United States, under the safe conduct or license of government. In such a predicament, it is clear, that though aliens, they would not be enemies, but might sue and be sued in our courts. Bynk. c. 25, § 8; Wells v. Williams, 1 Ld. Raym. 282. And in respect to the corporation itself, although established in Great Britain, it may have the safe conduct or license of the government of the United States for its property, and the maintenance of its corporate rights. It is clearly competent for the government, under the general rights of war, to grant letters of protection, and thereby to suspend the hostile character of any person; and when he has such protection, wherever he may be domiciled, he is to be considered, quoad hoc, a neutral. Bynk. c. 7; Usparicha v. Noble, 13 East. 332.

Nor is there, in this respect, any difference between a corporation and an individual. And it would be highly injurious to humanity, as well as public policy, if institutions established in a foreign country for religious, literary or charitable purposes, might not, during war, obtain protection and patronage for their laudable exertions to soften

private misery and diffuse private virtue. To support the motion in arrest of judgment, it is necessary for the court to negative every presumption, that could arise, of a safe conduct or license, either to the members or to the corporation itself. This cannot be done in the present case consistently with the principles of law. The suit was commenced in a time of peace, and every presumption, which can, ought to be made, to support it. It is sufficient, however, that by possibility the demandants, in their corporate capacity, and the capacity of their members, may have a persona standi in judicio, to entitle them to judgment.

There is another consideration also, which may properly weigh in this case. The suit was commenced during peace, and, on the declaration of war, it was competent for the tenants to plead the hostile alienage of the demandants, if it existed, in bar to the further prosecution of the suit, in the nature of a plea puis darrein continuance, as it was pleaded in Le Bret v. Papillon. 4 East, 502. They did not so plead, and thereby have affirmed the ability of the demandants to prosecute the suit to judgment. Upon this ground, where the disability of alien enemy occurred before judgment, and on a scire facias on the judgment the disability was pleaded, the plea has been held bad. West v. Sutton, 2 Ld. Raym. 853.

Another consideration derived from the express provision of the 9th article of the British treaty, of 1794, ought not to be omitted. That article stipulates, that British subjects, who then held land in the territories of the United States, and American citizens, who then held land in the dominions of his majesty, shall continue to hold them, according to the nature and tenure of their respective estates and titles therein, and may grant, sell and devise the same, to whom they please, in like manner as if they were natives; and that neither they, nor their heirs or assigns, shall, so far as respects the said lands and the legal remedies incident thereto, be regarded as aliens. This article has never been annulled, and therefore remains in full force. It deserves, and ought to receive, a liberal and enlarged construction. There can be no doubt, that corporations, as well as individuals, are within its purview; and the present claim not only may be, but in fact is, one which it completely embraces. The title of the demandants, as has been already stated, accrued before the revolutionary war. It was obviously the design of the contracting parties, to remove the disability of alienage, as to persons within the purview of the article, and to procure to them a perfect enjoyment and disposal of their estates and titles. If, during war, their right to grant, sell or devise, such estates and titles were suspended, it would materially impair their value. If the remedies incident to such estates for trespasses, disseisins, and other tor-

tious acts, were during war suspended, not only would the security of the property be endangered, but if war should last for many years, the statute of limitations of the various states, would, by lapse of time, bar the party of his remedy, and in some cases of his estate. This seems against the spirit and intent of the article, and puts the party upon the footing of an alien enemy, while the language concedes to him all the benefits of a native. Looking to the general moderation, with which the rights of war are exercised in modern times, under the policy, if not the law, of nations; perhaps it would not seem (for I mean not to give any absolute opinion) an undue indulgence, to hold, that as to all titles and estates within the article, an alien enemy may well maintain all the legal remedies, as in a time of peace. At least, it cannot be presumed, that in this favored class of cases, the party has not received the license or safe conduct of the government, to pursue his rights and remedies during the war. And unless such presumption can be made, when there are no facts on the record to warrant it, the plaintiffs must be entitled to judgment. Upon the whole, the motion in arrest of judgment must be overruled.

The other question, which has been argued upon the motion of the demandants, is yet of more delicacy and embarrassment. It is always an unwelcome task to call in question the constitutionality of the acts of a state legislature. It is still more unwelcome, when there has been an apparent acquiescence on the part of state tribunals, for whom this court cannot but entertain the most entire respect and confidence. The parties, however, have chosen to present the question before us, and we are bound to pronounce the law, as upon a careful examination we find it; and if an error be committed, it is a great consolation, that the decision here is not final, but a revision may take place before other judges, whose diligence, learning and ability, cannot fail to insure a most exact and well considered determination.

The demandants contend, first, that the act in question is in contravention of the 2d, 3d, 12th, 14th and 20th articles of the bill of rights, in the constitution of New Hampshire; and of the 10th section of the first article, and the 9th article of the amendments, of the constitution of the United States; and is also repugnant to natural justice; and is therefore void. Secondly, that the act, if constitutional, extends only to suits in the state courts, and not to suits in the courts of the United States; and, at all events, not to suits, in which a foreigner is a party. There is another objection, as to the shape in which the claims for the improvements are asserted in the pleadings, upon which it is unnecessary to say more, than that they have as much certainty, as has been deemed necessary in the practice of the state courts, and as seems

required by the act, and therefore, are good in substance.

The objection, that the act had in contemplation actions in state courts only, between citizens of the state, cannot prevail. Whatever force such an objection might properly have in cases of personal contracts executed without the territories of a state, where a remedy should be sought in the courts of the United States, under circumstances, in which the state laws could afford no remedy, it is a general rule of the law of nations, recognised by all civilized states, that rights and remedies respecting lands are to be regulated and governed by the law of the place, where the land is situated. Huber. tom. 2, lib. 1, tit. 3; Vatt. Law Nat. bk. 2, c. 7, § 85; Id. bk. 2, c. 8, §§ 109, 110. Independent, therefore, of the act of congress of September 24, 1789 (chapter 20, § 34), which declares, "that the laws of the states, except where the constitution, treaties, or statutes of the United States, shall otherwise require or provide, shall be regarded as rules of decision, in trials at common law, in the courts of the United States, in cases where they apply," the laws of the state regulating titles and remedies to real estate, must, in the absence of other regulations by the United States, be, upon general principles, the rules of decision equally between foreigners and between citizens.

In respect also to the constitution of the United States, the statute in question cannot be considered as void. The only article which bears on the subject, is that which declares, that no state shall pass "any ex post facto law, or law impairing the obligation of contracts." There is no pretence of any contract being impaired between the parties before the court. The compensation is for a tort, in respect to which the legislature have created and not destroyed an obligation. Nor is this an ex post facto law within this clause of the constitution, for it has been solemnly adjudged, that it applies only to laws, which render an act punishable in a manner, in which it was not punishable, when it was committed. Calder v. Bull, 3 Dall. [3 U. S.] 386; Fletcher v. Peck, 6 Cranch [10 U. S.] 87. The clause does not touch civil rights or civil remedies.

The remaining question then is, whether the act is contrary to the constitution of New Hampshire. Various clauses of that constitution have been cited; but that which seems most directly pointed to the case, and which must (if any one can) govern it, is the 23d article of the bill of rights, which declares, that "retrospective laws are highly injurious, oppressive and unjust. No such laws, therefore, should be made, either for the decision of civil causes or the punishment of offences."

What is a retrospective law, within the true intent and meaning of this article? Is it confined to statutes, which are enacted to take effect from a time anterior to their passage? or does it embrace all statutes, which, though operating only from their passage, affect vested rights and past transactions? It would be a construction utterly subversive of all the objects of the provision, to adhere to the former definition. It would enable the legislature to accomplish that indirectly, which it could not do directly. Upon principle, every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective; and this doctrine seems fully supported by authorities. Calder v. Bull, 3 Dall. [3 U. S.] 386; Dash v. Van Kleeck, 7 Johns. 477. The reasoning in these authorities, as to the nature, effect and injustice, in general, of retrospective laws, is exceedingly able and cogent; and in a fit case, depending upon elementary principles, I should be disposed to go a great way with the learned argument of Chief Justice Kent.

Let us now consider the particular facts of the case at bar, and the provisions of the act of the 19th of June, 1805. Before the passage of that act, the demandants had a clear vested right and title in the demanded premises in fee, absolute and unconditional; and although the seisin was in another, yet the existing laws afforded a complete remedy to perfect that title by an union juris et seisinae, under judicial process. The demandants were also entitled, both at law and equity, not only to the land, but to all the improvements thereon, which were annexed to the freehold, by whomsoever made, under that vested right and title. The law imputed no laches to the demandants for not pursuing their legal remedy to recover seisin, for the time of the statute of limitations had not run against them; and it imposed no obligation to pay for any amelioration of the soil, or any erections, which had been made by any person claiming an adverse possession or seisin. Then came the act, which, in the third section, provides "that when any action shall be brought against any person for the recovery of any lands or tenements, which such person holds by virtue of a supposed legal title, under a bona fide purchase, and which the occupant, or the person under whom he claims, has been in the actual peaceable possession and improvement of for more than six years before the commencement of the action, the jury which tries this action, if they find a verdict for the plaintiff, shall also inquire and by their verdict ascertain, the increased value of the premises by virtue of the buildings and improvements made by such person or persons, or those under whom he or they claim, and no writ of seisin or possession shall issue upon such judgment, until such plaintiff shall have paid into the hands of the clerk of said court, for the use of the defendant, or person or persons justly entitled thereto, such sum as

said jury shall assess, as aforesaid, which sum shall be paid to the clerk within one year after the verdict rendered by the jury, otherwise no writ of possession shall issue." This section was to take effect from the passage of the act.

The present action was brought in 1807, and if, as the tenants contend, the act applies to it, it must be upon the ground, that the six years' possession under a supposed legal title is to be calculated backwards, from the time of the commencement of the action, although that time should not have elapsed after the date of the act. And in this view, the argument to support its constitutionality must be the same, as though the action were commenced immediately after the passage of the act. It may be admitted, that if this were a mere statute of limitations, barring the actions in the realty after a reasonable time, under the exercise of legislative discretion, its constitutionality could not be doubted. And if the statute had declared, that if a party entitled should, for six years after passing the act, or for six years after any ouster or disseisin in futuro, neglect to pursue his remedy for the recovery of his right, then the recovery should only be had upon the terms of the act, it might, perhaps, have fallen under the same consideration, for it would in effect be only a rigorous statute of limitations.

But if the legislature were to pass an act of limitations, by which all actions upon past disseisins were to be barred, without any allowance of time for the commencement thereof in futuro, it would be difficult to support its constitutionality, for it would be completely restrospective in its operation on vested rights. Call v. Hagger, 8 Mass. 423. But the present cannot be considered as a statute merely regulating a remedy, and prescribing the mode and time of proceeding. It confers an absolute right to compensation on one side, and a corresponding liability on the other, if the party would enforce his previously vested title to the land. And unless he should comply within a given time, his title, or, what is in effect the same thing, his remedy, is completely extinguished. It is not, therefore, in form, or, in substance, a modification of the remedy, but a direct extinguishment of a vested right in all the improvements and erections on the land, which were annexed to the freehold. It also directly impairs the value of the vested right of the party in the land itself, inasmuch as it impairs the remedy, and subjects the party to burthens, which may render the right not worth pursuing; and that too upon past considerations, respecting which the party had incurred no legal obligation, and had imputed to him no legal laches. If, indeed, it ought, as is alleged, to be the very essence of a new law, that it is to be a rule for future cases, "nova constitutio futuris formam imponere debet, non praeteritis." (Bract. lib. 4, fol. 228), and that it is against natural justice to ap-

ply it to past cases, it would seem to follow, that an act, which works the effects, which have been stated, ought to be deemed a retrospective law within the prohibition of the constitution of New Hampshire; for it is a law for the decision of a civil cause, which affects past cases; and has a retroactive operation.

It is argued by the tenants' counsel, that although there was no legal remedy, yet there was an equitable right in the tenants, before the statute, to compensation for the amelioration of the soil, and the improvements made by erections thereon; that upon the principles of natural justice, it is iniquitous that one man should enjoy the fruits of another man's labor; that until a recovery actually obtained by the demandants, they had no vested title to such improvements, but the title remained in the tenants; and therefore the statute had no operation to devest previous rights. In this respect the case is likeened to that of temporary fixtures and erections, made by a tenant for years during his term, in which the reversioner has never been supposed to have any interest whatever.

It is difficult to perceive the foundation of the equitable or moral obligation, which should compel a party to pay for improvements, that he had never authorized, and which originated in a tort. If every man ought to have the fruits of his own labor, that principle can apply only to a case, where the labor has been lawfully applied, and the other party has voluntarily accepted those fruits without reference to any exercise of his own rights. For if, in order to avail himself of his own vested rights, and use his own property, it be necessary to use the improvements wrongfully made by another, it would be strange to hold, that a wrong should prevail against a lawful exercise of the right of property. In the case of a tortious confusion of goods, the common law gives the sole property to the other party without any compensation. Yet the equity in such case, where the shares might be distinguished, would seem such stronger than in the present case.

There would also have been plausibility in the argument, if the statute had confined itself to visible erections made by the tenant, who had been six years in possession, under a supposed legal title. But the improvements may be altogether in the soil, and even made by the original wrong doer, and yet the compensation must be allowed. And they may be just such improvements, as, in the case of a rightful tenancy, would at common law be deemed waste. It is sufficient, however, that no such equitable right, as is now contended for, is recognised in the law; and indeed it has been deemed so far destitute of moral obligation, that even an express promise, to pay for improvements made by a person coming in under a defective title, has been held a nude pact. Frear v. Hardenbergh, 5 Johns. 272.

As to the argument, that the demandants

had no vested title in the improvements until a recovery, it is clearly unfounded in law. In respect to the amelioration of the soil by labor, (which is embraced both by the statute and the verdict) it would be absurd to contend, that the amelioration was a thing separate from the soil, and capable of a distinct ownership. In respect to erections, the common law is clear, that every thing permanently annexed to the freehold passes with the title of the land, and vests with it. And here lies the distinction as to fixtures during a lease. They are not deemed to be permanently annexed to the soil, and may, therefore, well be removed; and so indeed would the law be, as to like fixtures by a mere trespasser. Taylor v. Townsend, 8 Mass. 411. The right then to permanent erections follows as a necessary and inseparable incident to the right of the soil, and is not acquired, but is merely reduced into possession, by a subsequent suit.

On the whole, if the statute must have a construction, which will embrace the case at bar, with whatever reluctance it may be declared, in my judgment it is unconstitutional, inasmuch as it devests a vested right of the demandants, and vests a new right in the tenants, upon considerations altogether past and gone.

But there is a construction, which although not favored by the exact letter, may yet well stand with the general scope of the statute, and give it a constitutional character; and that is, to give it a prospective operation, so as to apply to improvements made after the statute, and where the possession has been for six years after its date. In deference to the legislature, this construction ought to be adopted, if by law it may. And upon the authority of Helmore v. Shuter, 2 Show. 17, 2 Mod. 310 (1 Freem. 466; 2 Lev. 227; 2 Jones, 108; 1 Vent. 330), and Couch v. Jeffries, 4 Burrows, 2460, and Dash v. Van Kleeck, 7 Johns. 477, where the wording of the statutes was equally strong, I do not at present perceive any difficulty in adopting it. In either view, the tenants can take nothing by their claims for improvements, and judgment must pass for the demandants, and a writ of seisin issue immediately non obstante veredicto quoad haec. See Fox v. Southack, 12 Mass. 143; Hutchinson v. Brock, 11 Mass. 119.

Judgment was entered on the record as follows:

All which being seen and considered, it appears to the court here, that the tenants are not by law entitled to the value of the buildings and improvements so as aforesaid found by the verdict aforesaid, or to any part thereof, under the statute of New Hampshire in this behalf provided. It is therefore considered by the court, that the demandants recover their seisin and possession of the demanded premises, whereof the jury have by their verdict aforesaid found that they were dis-

seised by the tenants—and that a writ of seisin immediately issue in this behalf; and further that the demandants recover of the tenants their costs of suit taxed at ———. And as to the residue of the demanded premises, that the tenants go thereof quit without day.