David **HENRY**, an individual; Meagen Henry, an individual; David Kane Henry and Meagan R. Thomas Family Living Trust, a California living trust, Plaintiff,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, in its own name and as Receiver for IndyMac Bank, F.S.B.; Does 1 through 10, Defendants.**

Case No. CV 08–06625 MMM (AJWx).

United States District Court,
C.D. California.

Feb. 18, 2010.

---

**11.** This disposition makes it unnecessary to consider plaintiff's remaining contentions.

Guy C. Nicholson, Michael D. Stein, Tisdale and Nicholson, Los Angeles, CA, for Plaintiff.

Alex Edwin Spjute, Rita Maria Haeusler, Hughes Hubbard and Reed, Sanford M. Gage, Engage Mediation, Los Angeles, CA, Scott H. Christensen, Hughes Hubbard & Reed LLP, Washington, DC, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARGARET M. MORROW, District Judge.

On July 11, 2008, the Office of Thrift Supervision ("OTS") closed IndyMac Bank,

F.S.B. ("IndyMac") and appointed the Federal Deposit Insurance Corporation ("FDIC") as the bank's receiver pursuant to 12 U.S.C. § 1821(c)(2)(A). That same day, the FDIC formed IndyMac Federal Bank, a newly chartered depository institution, and transferred IndyMac's insured deposits to it. The FDIC made deposit insurance determinations for accounts held at IndyMac and notified depositors of the determinations via letter. Some depositors, including plaintiffs, later filed actions challenging the FDIC's deposit insurance determinations and/or alleging wrongful acts by IndyMac or its former employees prior to commencement of the receivership.

The parties filed opening briefs on July 13, 2009,[1] and responding briefs on July 27, 2009.[2] On July 31, 2009, the court granted plaintiffs' request for oral argument and set a hearing for October 19, 2009.

## I.  FINDINGS OF FACT

### A.  The Accounts

1.  Plaintiffs David Henry, Meagan Henry, and the David Kane Henry and Meag-

an R. Thomas Living Trust ("Trust") had five accounts with IndyMac prior to July 11, 2008.[3]

2.  Prior to July 11, 2008, account XXXXXX4758 had a balance of $109,560.69, account XXXXXX4767 had a balance of $109.747.71, account XXXXXX0486 had a balance of $404,165.09, account XXXXXX8793 had a balance of $11,250.55, and account XXXXXX4185 had a balance of $100.00.[4] The funds deposited in the five accounts belonging to the Trust thus totalled $634,824.04.[5]

3.  All five accounts were revocable trust accounts held in the name of the Trust.[6]

4.  Meagan Henry and David Henry deposited funds to the accounts,[7] and were the only trustees of the Trust.[8]

5.  The Trust had eight beneficiaries: William Henry, Steven Henry, and Michael Henry, identified as brothers of David Henry; Sarah Fareli, Bridget Meckli, and Aaron Thomas, identified as sisters of Meagan Henry; Rachel Cronin, identified as the sister of both Meagan and

---

1.  Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagan R. Thomas Family Trust's Opening Brief ("Henrys' Brief"), Docket No. 24 (July 13, 2009); Defendant Federal Deposit Insurance Corporation's Opening Trial Brief ("FDIC's Brief"), Docket No. 2, (July 13, 2009). Prior to this date, plaintiffs advised the court that they did not seek discovery beyond the administrative record produced by the FDIC. (Notice re: Request for Additional Discovery and/or Objections to Contents of Administrative Record, Docket No. 22 (June 8, 2009).) That is the record, therefore, to which the court looks in deciding the action.

2.  Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Trust's Reply Brief; Request for Oral Argument ("Henrys' Reply"), Docket No. 27 (July 27, 2009); Defendant Federal Deposit Insurance Corporation's Response Trial Brief

("FDIC's Reply"), Docket No. 26 (July 27, 2009).

3.  Declaration of Melissa Howard Attaching Administrative Record ("Howard Decl."), Docket No. 18 (Apr. 13, 2009), ¶ 2; Exh. A (Administrative Record ("AR")) at 2.

4.  Howard Decl., ¶ 2; AR, Exh. A at 2. All but the last four digits of the account numbers are redacted to protect the personal information of the account holder. (Howard Decl., ¶ 2 n. 1.)

5.  Howard Decl., ¶ 2; AR, Exh. A at 2.

6.  AR, Exh. A at 2; Howard Decl., ¶ 2; Henrys' Brief at 2.

7.  AR, Exh. B ("Depositor Interview Form").

8.  AR, Exh. C ("Declaration for Trust").

David Henry; and John Wall, identified as a friend of Meagan and David Henry.[9]

## B. The FDIC's Insurance Determination

6. The FDIC as receiver for IndyMac assigned Melissa Howard to review deposit insurance coverage and claims arising out of IndyMac's failure. Howard reviewed the five accounts at issue in this case.[10]

7. On August 8, 2008, Howard interviewed both depositors and explained her preliminary determination regarding the amount of insured and uninsured funds in the accounts. The Henrys provided no further material information, but asserted that, at the time they opened the accounts, IndyMac had assured them the accounts would be fully insured. The Henrys also stated that they felt the FDIC's informational material did not clearly explain the regulations governing the insuring of revocable trust accounts.[11]

8. On August 8, 2008, Howard concluded that under the deposit insurance rules then in effect, the Trust had sixteen "beneficial relationships," defined as a relationship between one trustee and one beneficiary. Howard also concluded that only seven beneficial relationships involved qualifying beneficiaries (brothers and sisters), and that the remaining nine involved non-qualifying beneficiaries (brothers-in-law, sisters-in-law, and a friend). Howard concluded that the seven qualifying beneficiaries were insured and that the nine non-qualifying beneficiaries were uninsured. She therefore found that the seven qualifying beneficiaries were insured for a one-sixteenth share of the funds,[12] or $277,735.52.[13]

9. Howard determined that the remaining funds, which belonged to the nine non-qualifying beneficiaries, reverted to the single ownership of the two depositors, Meagan and David Henry. As single owners, they were insured for an additional $100,000 per depositor.[14]

10. Howard thus concluded that the total amount insured was $477,735.52 and that the total amount uninsured was $157,088.52.[15]

11. On August 9, 2009, the FDIC sent Meagan and David Henry a Notice of Allowance of Claim ("Notice") and a Receivership Certificate in the amount of $157,088.54.[16]

12. Based on the FDIC's calculation that the ultimate resolution of IndyMac's assets would result in a recovery of approximately 50% of the uninsured deposits of IndyMac, FDIC sent the Henrys a 50% advance dividend of $78,544.27.

## II. CONCLUSIONS OF LAW

### A. Standard of Review

13. The FDIC's determination of insurance coverage is governed by the Federal Deposit Insurance Act ("FDIA"), as amended, 12 U.S.C. §§ 1811 et seq.

14. The FDIC's final determination "regarding any claim for insurance coverage [is] a final agency action reviewable in accordance with" the Administrative Procedure Act ("APA"). 12 U.S.C. § 1821(f)(4). Under the APA, the court

---

9. *Id.;* Howard Decl., ¶ 5 & n. 2.

10. Howard Decl., ¶ 1.

11. AR, Exh. B ("Depositor Interview Form").

12. Howard Decl., ¶ 5. A one-sixteenth share of $634,824.04 is $39,676.50.

13. *Id.* 5. $39,676.50 * 7 = $277,735.52.

14. *Id.*

15. *Id.* $634,824.04–$277,735.52 = $157,088.52.

16. *Id.,* ¶ 6. AR, Exh. D at 1–2.

examines whether the FDIC's decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the parties agree that the relevant question the court must answer is whether the FDIC's action was arbitrary or capricious.[17]

15. Final agency decision is arbitrary and capricious if the agency " 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *O'Keeffe's Inc. v. U.S. Consumer Product Safety Commission*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Manufacturers' Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

16. A district court is limited to a review of the reasoning on which the agency relied in making its decision. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir.2007) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943)). It can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Manufacturers Association*, 463 U.S. at 43, 103 S.Ct. 2856. Where an agency offers an "interpretation of its own regulation [that] reflects its considered views," even if those views are developed in response to litigation and communicated in a legal brief, the court should accept the interpretation if convinced it is not "merely a *post hoc* rationalization." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007). See also *Alaska v. Federal Subsistence Board*, 544 F.3d 1089, 1094 (9th Cir.2008)

("While we may not fabricate a rational basis for an agency's action, we will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,' " quoting *Motor Vehicle Manufacturers Association*, 463 U.S. at 43). " 'Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' " *Northwest Coalition for Alternatives to Pesticides (NCAP) v. United States Environmental Protection Agency*, 544 F.3d 1043, 1048 (9th Cir.2008) (quoting *Motor Vehicle Manufacturers Association*, 463 U.S. at 43).

17. "[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous' or inconsistent with 'the regulations being interpreted.' " *Public Citizen v. Nuclear Regulatory Commission*, 573 F.3d 916, 923 (9th Cir.2009) (quoting *Long Island Care at Home*, 551 U.S. at 171, 127 S.Ct. 2339). See also *Long Island Care at Home*, 551 U.S. at 170–71, 127 S.Ct. 2339 ("[A]s long as interpretive changes create no unfair surprise . . . change in interpretation alone presents no separate ground for disregarding the Department's present interpretation"); *River Runners for Wilderness v. Martin*, 574 F.3d 723, 736 (9th Cir.2009) ("[F]ederal agencies are entitled to some leeway when interpreting their own policies and regulations," citing *Stinson v. United States*, 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993)). "In other words, we must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.' " *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381,

---

**17.** Henrys' Brief at 3–4; FDIC's Brief at 3.

129 L.Ed.2d 405 (1994) (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)). See also *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.,* 339 F.3d 1126, 1131 (9th Cir.2003) ("When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations,'" quoting *Martin v. Occupational Safety & Health Review Commission,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)); *Wards Cove Packing Corp. v. National Marine Fisheries Service,* 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation").

### B. Whether the FDIC Properly Determined the Amount of Deposit Insurance to Which Plaintiffs Were Entitled under the Regulations Applicable on August 8, 2008

■ 18. The FDIC's deposit insurance determinations are governed the regulations set forth in 12 C.F.R. Part 330. Regulations governing recognition of deposit ownership and fiduciary relationships note that, except in circumstances not relevant here, when "determining the amount of insurance available to each depositor, the FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution." 12 C.F.R. § 330.5(a)(1).[18] See also *Villafane–Neriz v. F.D.I.C.,* 75 F.3d 727, 731 (1st Cir.1996) (holding that the FDIC "is entitled to rely exclusively on the account records of the failed institution," and that "while ownership under state law is one prerequisite for insurance coverage, the deposit account records are controlling"). "Deposit account records" include "account ledgers, signature cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the possession of the insured depository institution and other books and records of the insured depository institution, including records maintained by computer, which relate to the insured depository institution's deposit taking function." 12 C.F.R. § 330.1(e).[19] As noted, plaintiffs did not seek leave to conduct further discovery, and do not object to the contents of the administrative record.[20]

19. At the time IndyMac closed, revocable trust accounts were insured up to

---

**18.** The regulation continues:

"If the FDIC, in its sole discretion, determines that the deposit account records of the insured depository institution are clear and unambiguous, those records shall be considered binding on the depositor, and the FDIC shall consider no other records on the manner in which the funds are owned. If the deposit account records are ambiguous or unclear on the manner in which the funds are owned, then the FDIC may, in its sole discretion, consider evidence other than the deposit account records of the insured depository institution for the purpose of establishing the manner in which the funds are owned. Despite the general requirements of this paragraph (a)(1), if the FDIC has reason to believe that the insured depository institution's deposit account records misrepresent the actual ownership of deposited funds and such misrepresentation would increase deposit insurance coverage, the FDIC may consider all available evidence and pay claims for insured deposits on the basis of the actual rather than the misrepresented ownership." 12 C.F.R. § 330.5(a)(1).

**19.** The term excludes "account statements, deposit slips, items deposited or cancelled checks." 12 C.F.R. § 330.1(e).

**20.** Notice re: Request for Additional Discovery and/or Objections to Contents of Administrative Record, Docket No. 22 (June 8, 2008).

$100,000 per owner if certain conditions were met. First, the title of the account had to reflect that the funds were held pursuant to a formal revocable trust set up by an owner or grantor. The owner or grantor was required to retain ownership during his or her life. 12 C.F.R. § 330.10(f)(1), (4) (2008), 69 Fed. Reg. 2829–30 (Jan. 21, 2004) (stating that "revocable trust accounts held in connection with a formal revocable trust created by an owner/grantor and over which the owner/grantor retains ownership during his or her lifetime," qualify for coverage if "the title of the account ... reflect[s] that the funds in the account are held pursuant to a formal revocable trust"). Second, while the beneficiaries need not be identified by name in the deposit account records, they must be "qualifying" beneficiaries. The "owner's spouse, child/children, grandchild/grandchildren, parent/parents, brother/brothers or sister/sisters" are "qualifying beneficiaries." 12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999).[21]

20. When a revocable trust account was established by more than one owner and held for the benefit of others, some or all of whom were qualifying beneficiaries, the regulation provided that the respective interests of each owner held for the benefit of each qualifying beneficiary would be separately insured up to $100,000. 12 C.F.R. § 330.10(d) (2008), 63 Fed.Reg. 25760–61 (May 11, 1998). The owners were presumed to have equal interests in the account unless otherwise stated in the deposit account records. *Id.*

21. While the trust owner was the insured party, insurance coverage was provided for the interest of each qualifying beneficiary up to $100,000. 12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999); 12 C.F.R. § 330.10(f)(1) (2008), 69 Fed. Reg. 2829 (Jan. 21, 2004). If a named beneficiary of a revocable trust account was not a qualifying beneficiary, the funds held for the benefit of that beneficiary were treated as individually owned by the grantor. 12 C.F.R. § 330.10(c) (2008), 63 Fed. Reg. 25760 (May 11, 1998).

22. Stated differently, the FDIC insured each grantor up to $100,000 for the interest of each qualifying beneficiary. If each grantor held an amount for the benefit of the same qualifying beneficiary, those amounts were separately insured. 12 C.F.R. § 330.10(d) (2008), 63 Fed. Reg. 25760–61 (May 11, 1998); Advisory Opinion FDIC–05–05, Question Regarding Deposit Insurance for a "Spousal Revocable Living Trust," 2005 WL 2979649, *1–2 (Sept. 12, 2005) ("Under this rule, the FDIC would assume ... that the two grantors ... have contributed equal amounts.... The amount contributed by each grantor for each 'qualifying beneficiary' would be insured separately"). In making its insurance determination, therefore, the FDIC assumes that, unless otherwise stated, each grantor has contributed 50% of the funds in the account. Advisory Opinion FDIC–05–05, 2005 WL 2979649 at *2 ("[Where B and C are two grantors], with an account balance of $550,000, the FDIC would assume that B has contributed $275,000 and that C has contributed $275,000. The funds contributed by B would be insured separately from the funds contributed by C"). It then analyzes insurance coverage as if the revocable trust account were two accounts, each holding 50% of the funds, and there were separate trustee-beneficiary relationships

---

**21.** Under the regulations in effect when IndyMac closed and the FDIC made the insurance determination challenged in this action, there was "no requirement ... that the deposit account[ ] records of the depository institution indicate the names of the beneficiaries of the living trust and their ownership interests in the trust." 12 C.F.R. 330.10(f)(1), (4) (2008) 69 Fed. Reg. 2830 (Jan. 21, 2004).

between each grantor and each beneficiary. *Id.* at *2–4. As a result, in a situation where there are two grantors and a single qualifying beneficiary, insurance coverage of $200,000 is available. *Id.* (describing a hypothetical in which a daughter is a qualifying beneficiary of both grantors, and each grantor is therefore insured to $100,000). Conversely, where a person is a qualifying beneficiary of one grantor, but a non-qualifying beneficiary of the second, only the qualifying relationship is insured.[22]

23. In this case, there are two grantors and eight beneficiaries. Howard thus determined that there were sixteen beneficial relationships, each of which held a one-sixteenth share of the amount deposited. Of the sixteen beneficial relationships, seven were qualifying sibling relationships, while nine were non-qualifying sister-in-law, brother-in-law, and friend relationships.[23] The FDIC presumed that the grantors held an equal one-sixteenth share for the benefit of each beneficiary, or $39,676.50. Because seven shares were insured under § 330.10, the FDIC determined that the Henrys were entitled to receive $277,735.52 in insurance for the revocable trust account.

24. The funds held for the benefit of non-qualifying beneficiaries were treated as owned by the two grantors. The FDIC thus determined that each of Meagan and David Henry was entitled to receive additional $100,000 in insurance coverage.

25. The FDIC's final deposit determination regarding plaintiffs' accounts was in accordance with the law and supported by the evidence upon which FDIC was required to rely. Although plaintiffs dispute whether the regulation in effect at the time the deposit insurance determination was made applies, and also contend that the regulation was "too vague and complex to understand or apply," they do not dispute that the FDIC correctly applied the regulation to their accounts.[24]

### C. Whether the Prior Regulation Was Arbitrary or Capricious

26. Plaintiffs do not explicitly challenge the prior regulation's validity. Rather, they assert that it was "too ambiguous and complex for the public to understand," and that it was so "flawed" that the FDIC took the unusual step of implementing an interim rule before the notice and comment period.[25] Despite plaintiffs' criticisms, the court concludes that the regulation was not an arbitrary or capricious interpretation of the governing statute.

27. Courts give broad deference to an agency interpretation so long as it meets the test set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, if the court determines that "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir.2009). "Second, if a statute is silent or ambiguous with respect to the issue at hand, we must defer to the agency so long as the agency's answer is based on

---

**22.** While this advisory opinion does not appear in the Federal Register, it does represent an authoritative opinion of the FDIC regarding the interpretation of its own rules. *Public Citizen*, 573 F.3d at 923 (quoting *Long Island Care at Home*, 551 U.S. at 171, 127 S.Ct. 2339) ("[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly

erroneous' or inconsistent with 'the regulations being interpreted' ").

**23.** Howard Decl., ¶ 5.

**24.** Henrys' Reply at 3–4.

**25.** *Id.* at 2–3.

a permissible construction of the statute.'" *Satterfield*, 569 F.3d at 952 (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). "An agency's interpretation is permissible, unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778).

28. While *Chevron* concerned formal notice-and-comment rulemaking by an agency, the Supreme Court clarified in *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Wilderness Society v. U.S. Fish & Wildlife Service*, 353 F.3d 1051, 1060 (9th Cir.2003) (quoting *Mead*, 533 U.S. at 226–27, 121 S.Ct. 2164). "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead*, 533 U.S. at 227, 121 S.Ct. 2164. "Those administrative decisions not meeting these standards may still be given deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 [65 S.Ct. 161, 89 L.Ed. 124] (1944)." *Satterfield*, 569 F.3d at 952–53.

29. Applying this test, "[t]he first step under the *Chevron* analysis is to determine 'whether Congress has directly spoken to the precise question at issue.'" *Satterfield*, 569 F.3d at 953 (quoting *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. "It is well settled that the starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 56, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (internal citation and quotation marks omitted). "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).

30. Congress has delegated to the FDIC the authority to make rules and regulations to implement the FDIA. See 12 U.S.C. § 1821(d) (1). Section 1821(a) provides that deposits maintained by a depositor in the same capacity and the same right at an insured depository institution must be aggregated and insured up to the standard maximum deposit insurance amount ("SMDIA"). The Act does not define "depositor," "capacity," or "right." See 63 Fed. Reg. 25750 (May 11, 1998). Although § 1817(i)(1) provides a special rule for insurance of irrevocable trust accounts, no section of the act specifically addresses insurance of revocable trust accounts. Section 1821(a)(1)(C) requires that the FDIC "aggregate the amounts of all deposits in the insured depository institution which are maintained by a depositor in the same capacity and the same right for the benefit of the depositor either in the name of the depositor or in the name of any other person." The statute does not provide any further definition or guidance regarding the insurance to be provided for revocable trust accounts that have multiple grantors and beneficiaries such as the ones at issue here.

31. Although Congress has mandated that FDIC promulgate rules governing the insurance of deposit accounts, it has not spoken clearly on the insurance to be provided for revocable trust accounts. Indeed, it appears that the relevant statutory provisions were enacted before revocable

trust accounts became popular in the late 1980s and early 1990s. See 69 Fed. Reg. 2825 (Jan. 21, 2004). Thus, "Congress could not have spoken clearly to this issue ... when the statute was enacted." *Satterfield,* 569 F.3d at 954. For all of these reasons, the court concludes that the statute is silent as to the rules governing insurance of revocable trust accounts.

32. " 'When a statute is ambiguous or leaves key terms undefined, a court must defer to the federal agency's interpretation of the statute, so long as such interpretation is reasonable.' " *Peck v. Cingular Wireless, LLC,* 535 F.3d 1053, 1056 (9th Cir.2008) (citing *Metrophones Telecommunications, Inc. v. Global Crossing Telecommunications, Inc.,* 423 F.3d 1056, 1067 (9th Cir.2005)). Because the FDIA "is silent to the issue at hand, we must defer to the agency so long as the agency's interpretation 'is based on a permissible construction of the statute.' " *Satterfield,* 569 F.3d at 954 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). The FDIC's interpretation is permissible unless "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778.

33. The FDIC promulgated a regulation providing that a revocable trust account "shall be insured up to $100,000 for the prospective interest of each of the owner's designated beneficiaries." 63 Fed. Reg. 25752 (May 11, 1998). See also 64 Fed. Reg. 15654 (Apr. 1, 1999) ("[T]he $100,000 insurance limit is not applied on a 'per owner' basis. Rather, the $100,000 insurance limit is applied on a 'per beneficiary' basis to all [ ] accounts owned by the same person at the same insured depository institution. For instance, a [revocable trust] account owned by one person would be insured up to $500,000 if the account names five qualifying beneficiaries"). The

"per beneficiary" insurance was available only for "qualifying beneficiaries." Originally, these were spouses, children, and grandchildren. In 1999, however, the FDIC added siblings and parents as qualifying beneficiaries. *Id.*[26]

34. Where a revocable trust account is established by more than one depositor, and held for the benefit of others, some or all of whom are qualifying beneficiaries, "the respective interests of each owner (which shall be deemed equal unless otherwise stated in the insured depository institution's deposit account records) held for the benefit of each qualifying beneficiary [are] separately insured up to $100,000." 63 Fed. Reg. 25761 (May 11, 1998). In other words, "[t]he amount contributed by each grantor for each 'qualifying beneficiary' [is] insured separately." Advisory Opinion FDIC–05–05 at *1.

35. When a beneficiary of an account is not a qualifying beneficiary, the funds held for that beneficiary are treated as individually owned by each of the grantors, and are aggregated with other accounts owned by the grantors at the institution. Each grantor is insured for all accounts he or she owns up to $100,000. 63 Fed. Reg. 25760 (May 11, 1998).

36. The FDIC recognized that "the rules governing the insurance of [revocable] trust accounts are complex and confusing." 69 Fed. Reg. 2826 (Jan. 21, 2004). "Consequently, in response to questions about coverage of [revocable] trust accounts, the FDIC ... advise[d] depositors and bankers that they should assume that such accounts will be insured for no more than $100,000 per grantor, assuming the grantor has no single-ownership funds in the same depository institution. Otherwise, the FDIC suggest[ed] that the owners of living trust accounts seek advice from the

---

**26.** It appears the definition of a qualifying beneficiary and the provision of "per benefi- ciary" insurance dates back at least to 1967. 32 Fed. Reg. 10408 (July 14, 1967).

attorney who prepared the trust document. Depositors who contact[ed] the FDIC about their living trust insurance coverage [were] often troubled to learn that they [could not] definitively determine the amount of their coverage without a legal analysis of their trust document." *Id.* To ameliorate this confusion, in 2005 the FDIC issued an advisory opinion that explained in detail how a revocable trust with two grantors and multiple qualifying and non-qualifying beneficiaries would be treated. Advisory Opinion FDIC–05–05. While application of the regulation is complex, plaintiffs cite no authority for the proposition that complexity alone compels a finding that a regulation is an arbitrary or capricious interpretation of the governing statute. Moreover, the FDIC has endeavored to prevent unfair surprise by recommending that depositors seek legal advice and assume that beneficiaries are not insured, 69 Fed. Reg. 2826 (Jan. 21, 2004), and by providing a detailed explanation of the insurance treatment of revocable trust accounts with accompanying examples, Advisory Opinion FDIC–05–05.

37. The FDIC's regulation is consistent with the purpose of the statute—to insure the deposits of all insured depository institutions, 12 U.S.C. § 1821(a)(1)(A), while simultaneously setting limits on such insurance by establishing a maximum deposit insurance amount, 12 U.S.C. § 1821(a)(1)(B), and requiring the aggregation of deposits maintained by a depositor at a single institution, 12 U.S.C. § 1821(a)(1)(C). There is no evidence that the FDIC's interpretation was "arbitrary, capricious, or manifestly contrary to the statute." Consequently, the court concludes it is entitled to deference.

### D. The New Regulation

38. On September 30, 2008, the FDIC promulgated a new interim rule that eliminated the concept of qualifying beneficiaries. It noted that "depositors, consumer groups and bankers have questioned the fairness of limiting the coverage on revocable trust accounts to the naming of certain beneficiaries," 73 Fed. Reg. 56708 (Sept. 30, 2008), and that eliminating the concept of qualifying beneficiaries would make "the coverage rules easier to understand. Depositors and bankers no longer need to know who is a qualifying beneficiary and who is not.... Thus, under the interim rule, the FDIC anticipates being able to make quicker deposit insurance determinations on revocable trust accounts at institution failures." *Id.*

39. Under the interim rule, a revocable trust account with an aggregate balance exceeding $500,000 and naming more than five beneficiaries is insured for the greater of $500,000, or the "aggregate amount of the ownership interests of each different beneficiary named in the trusts." 12 C.F.R. § 330.10(e) (interim rule), 73 Fed. Reg. 56711 (Sept. 30, 2008). Because plaintiffs' trust had eight beneficiaries, it would be entitled to insurance of $800,000, an amount exceeding the actual deposits.

40. The interim rule is "effective as of September 26, 2008 for all existing and future revocable trust accounts." 12 C.F.R. § 330.10(i) (interim rule), 73 Fed. Reg. 56712 (Sept. 30, 2008). See also 73 Fed. Reg. 56710 (Sept. 30, 2008) ("The interim rule is effective on September 26, 2008, the date on which the FDIC Board of Directors approved the interim rule").

### E. Whether Plaintiffs' Account Was "Existing" on September 26, 2008

41. Plaintiffs argue that their "accounts undeniably existed when the [interim rule] was implemented." [27] As evi-

---

**27.** Pls.' Response at 3.

dence of this, they present a letter dated November 4, 2008, in which the FDIC advised plaintiffs that "additional documentation is needed regarding your formal and/or informal trust accounts." The letter requested plaintiffs' cooperation in "finalizing [the] account determination." [28]

42. While the FDIC's letter provides some evidence as to whether the agency's insurance determination was final, it provides no evidence as to whether the account itself was in existence. The statement that additional documentation is needed regarding plaintiffs' trust accounts does not indicate whether the accounts are "past" or "existing."

43. The court requested that the parties submit supplemental briefs addressing whether the trust accounts were "existing" as of September 26, 2008. In response, plaintiffs proffered several documents in which the FDIC referred to or treated the accounts as in existence on that date.[29] A July 11, 2008 press release regarding IndyMac's closure announced that all of the bank's assets would be transferred to IndyMac Federal Bank, an institution the FDIC would operate.[30] The press release assured IndyMac depositors that they would automatically become customers of the new federal bank, and would "continue to have uninterrupted customer service and access to their funds." [31] On July 23, 2008, IndyMac Federal Bank sent plaintiffs a letter stating that IndyMac Federal Bank would not change the "terms and conditions on any of [plaintiffs'] existing accounts." [32] The FDIC contends that the trust accounts at IndyMac Federal Bank are not the same accounts that plaintiffs held at IndyMac.[33] It asserts that deposit accounts are insured only through a particular insured depository institution, and that, when an account is transferred to a new bank, it is not considered the same account. See 12 U.S.C. § 1821(a)(1) (A) ("The [FDIC] shall insure the deposits of all insured depository institutions as provided in this chapter").

44. The FDIC asserts that it implements the statutory requirement that insurance determinations and payments occur "as soon as possible," 12 U.S.C. § 1821(f)(1), by fixing a depositor's rights "as of the day of failure," 73 Fed. Reg. 2364 (Jan. 14, 2008). The rule the FDIC cites, although proposed prior to IndyMac's closure, was not adopted until six days after IndyMac's failure. 73 Fed. Reg. 41170 (July 17, 2008). The FDIC thus concedes, as it must, that the rule was not in effect as of July 11, 2008. It contends, however, that the rule embodies "the FDIC's long-standing practice of determining a depositor's insurance as of the date of closure." [34] Moreover, although not final as of September 26, 2008, the rule was drafted prior to that date, and provides some insight regarding the agency's intent with respect to the treatment of existing accounts.

45. The FDIC also cites *Lambert v. Federal Deposit Insurance Corp.*, 847 F.2d

---

28. *Id.*, Exh. A.

29. Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Living Trust's Supplemental Brief ("Henrys' Supp. Brief"), Docket No. 32 (Sept. 22, 2009).

30. *Id.* at 2.

31. *Id.* at 3.

32. Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Living Trust's Supplemental Evidentiary Submission, Docket No. 33 (Sept. 24, 2009) at 2.

33. Defendant Federal Deposit Insurance Corporation's Supplemental Trial Brief ("FDIC's Supp. Brief"), Docket No. 31 (Sept. 22, 2009) at 2.

34. *Id.* at 4 n. 2.

604 (9th Cir.1988), in support of its position. Although not directly on point, *Lambert* describes the date on which a bank closes as the "critical date" for purposes of the FDIC's insurance determination. *Lambert* examined whether a trust was revocable or irrevocable, a question which turned on which the "surviving trustor" had died as of the date of the insurance determination. *Id.* at 607. *Lambert,* therefore, addressed the critical date for purposes of factual determinations relevant to the amount of insurance available. Here, the issue is somewhat different, i.e., what date is critical for purposes of determining the applicable *law.* The remaining cases cited by the FDIC similarly concern factual determinations rather than the applicability of a change in the law. *Villa-fane–Neriz,* 75 F.3d at 730 (holding that the FDIC may rely on erroneous bank records to determine whether there was an insured deposit "at the time of [the bank's] failure"); *Federal Deposit Insurance Corp. v. Liberty National Bank & Trust Co.,* 806 F.2d 961, 964–65 (10th Cir. 1986) (holding that "no additional rights can be created after insolvency," but that beneficiary's claims under standby letters of credit were provable against the FDIC as receiver despite the fact that the beneficiaries made their demand after the bank's insolvency because the claims were fixed as of the date of insolvency); *Federal Deposit Insurance Corp. v. McKnight,* 769 F.2d 658, 661 (10th Cir.1985) (reviewing whether the FDIC had mistakenly paid funds on a cashier's check, and holding that a bank's closure "not only triggered the liquidation process, but it also cast in stone the relationship of defendants to the bank"); *American National Bank of Jacksonville v. Federal Deposit Insurance Corp.,* 710 F.2d 1528, 1540 (11th Cir.1983) (holding that a plaintiff cannot rely on factual events that take place subsequent to a bank's closure to support its claimed ownership of escrow funds). Plaintiffs'

case authority similarly addresses the critical date for factual determinations relevant to the insurance determination.

46. The FDIC also argues that its interpretation of the regulation is entitled to deference. "When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations.'" *Oregon Paralyzed Veterans of America,* 339 F.3d at 1131 (quoting *Martin,* 499 U.S. at 150–51, 111 S.Ct. 1171). See also *Wards Cove,* 307 F.3d at 1218 ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation"). The court concludes that the FDIC's interpretation of the meaning of existing account as tied to a particular depository institution is reasonable, particularly in light of the statutory mandate that the FDIC insure the "deposits *of all depository institutions."* 12 U.S.C. § 1821(a)(1)(A) (emphasis added). The court is mindful that the FDIC articulated this rationale only in a legal brief at a late stage of this litigation. Because plaintiffs adduce no evidence that the term "existing account" has been applied inconsistently in other cases, because the interpretation is consistent with the FDIC's practice of determining insurance coverage as of the date of a bank's closure, and because the interpretation is a reasonable construction of the interim rule, the court affords the FDIC's interpretation deference and finds that plaintiffs' trust accounts at IndyMac were not "existing" on September 26, 2008, as that term is used in the interim rule. See *Long Island Care at Home,* 551 U.S. at 171, 127 S.Ct. 2339 (where an agency's "interpretation of its own regulation reflects its considered views," even if those

views were developed in response to litigation and set forth in a legal brief, the court should accept its interpretation so long as it is not "merely a *post hoc* rationalization").

### F. Whether the Court Must Apply the Interim Rule Under *Bradley*

▮▮▮▮ 47. That the FDIC correctly applied the old regulation does not end the inquiry, however. Plaintiffs argue that, notwithstanding the FDIC's regulatory interpretation, the rule in *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), mandates that "a court ... apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Id.* at 711, 94 S.Ct. 2006. See also *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) ("[A]n appellate court must apply the law in effect at the time it renders the decision"); *DeGurules v. I.N.S.*, 833 F.2d 861, 863 (9th Cir.1987) ("[I]n great national concerns ... the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside," quoting *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801) (omission original)). *Bradley* emphasized that "even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." *Bradley*, 416 U.S. at 715, 94 S.Ct. 2006.[35]

48. Retroactive application of a rule is disfavored. *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208–09, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result"). "Fairness concerns dictate that courts must not lightly disrupt settled expectations or alter the legal con-

**35.** Following oral argument, plaintiffs filed a notice of supplemental authorities, citing four cases in which the FDIC had taken the position that *Bradley* applied rather than *Bowen*. (Plaintiffs David Henry, Meagen Henry, David Kane Henry and Meagen R. Thomas Family Living Trust's Supplemental Authorities, Docket No. 36) (Oct. 20, 2009) (citing *F.D.I.C. v. Faulkner*, 991 F.2d 262, 265–66 (5th Cir.1993) ("FDIC/Receiver contends that we should apply the apparently conflicting rule set down in *Bradley* "); *Federal Deposit Insurance Corp. v. Yemelos*, 778 F.Supp. 329, 331 (E.D.La.1991) ("The FDIC argues that under *Bradley* [ ], laws are to be applied retroactively unless there is a clear Congressional intent to the contrary or if 'manifest injustice' would result"); *Federal Deposit Insurance Corp. v. Sullivan*, 744 F.Supp. 239, 241 (D.Colo.1990) ("The FDIC, also citing *Bradley*, urges that FIRREA's amendment to § 1823(e) be applied retroactively"); *Federal Deposit Insurance Corp. v. Dalba*, No. 89–C–712–S, 1990 WL 43750, *3 (W.D.Wis. Feb. 27, 1990) ("[FDIC] asserts that the Court must always apply current law to actions pending before it").) The FDIC responded with a detailed memorandum distinguishing each case from the present one. (Defendant Federal Deposit Insurance Corporation's Response to Plaintiffs' Supplemental Authorities, Docket No. 37 (Oct. 29, 2009).) Specifically, *Faulkner* involved a request for injunctive relief, and thus fit within *Landgraf*'s exception for prospective relief. *Faulkner*, 991 F.2d at 267. In *Yemelos*, the court found clear congressional intent that the Comprehensive Crime Control Act of 1990 be applied retroactively. *Yemelos*, 778 F.Supp. at 332. While the holdings in *Dalba* and *Sullivan*, where the courts retroactively applied a legal defense under 12 U.S.C. § 1823(e) may at first blush appear inconsistent with the FDIC's position in this action, they prove only that prior to the Supreme Court's decision in *Landgraf*, courts and the FDIC struggled to harmonize *Bradley* and *Bowen*. Plaintiffs' supplemental authorities do not demonstrate that the FDIC has ever taken a position inconsistent with that it advances here regarding the proper interpretation of *Landgraf*.

sequences of past actions." *Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 835 (9th Cir.1997). The Supreme Court in *Bowen* did not cite *Bradley* and hence created an " 'apparent tension' between 'the rule articulated in *Bradley*' and the 'generally accepted axiom' reaffirmed in *Bowen.*" *Gersman v. Group Health Association, Inc.,* 975 F.2d 886, 894–95 (D.C.Cir.1992) (quoting *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 837, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990)).[36]

49. The Supreme Court reconciled *Bradley* and *Bowen* in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The *Landgraf* Court affirmed the rule in *Bowen* that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* at 272, 114 S.Ct. 1483 (quoting *Bowen,* 488 U.S. at 208, 109 S.Ct. 468). The Court noted, however, the difficulty in determining whether a statute or rule is retroactive. It observed that it was necessary to "ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the

degree of connection between the operation of the new rule and a relevant past event." *Id.* at 269–70, 114 S.Ct. 1483.[37]

50. Affirming *Bowen*'s presumption against retroactivity, the Court interpreted *Bradley* as an exception to the general rule. The congressional enactment applied in *Bradley* was a provision governing awards of attorneys' fees in civil rights cases. Prior to its passage, federal courts were permitted to award fees based on equitable principles, as the district court in *Bradley* had done. "In light of the prior availability of a fee award, and the likelihood that fees would be assessed under pre-existing theories, [the Court] concluded that the new fee statute simply 'd[id] not impose an additional or unforeseeable obligation' on the school board." *Landgraf,* 511 U.S. at 278, 114 S.Ct. 1483 (quoting *Bradley,* 416 U.S. at 721, 94 S.Ct. 2006).

51. In *Landgraf,* the Supreme Court identified three exceptions to the presumption against retroactivity. It first cited *Thorpe,* which held that a new agency policy requiring a local housing authority to give notice and an opportunity to respond before evicting a tenant applied to an eviction proceeding commenced before it was enacted. *Thorpe,* 393 U.S. 268 at 279, 89 S.Ct. 518. The *Landgraf* Court

**36.** In *Kaiser,* the Supreme Court expressly declined to reconcile the two lines of precedent because it concluded that Congress clearly intended that a statutory amendment was to apply prospectively only. *Kaiser,* 494 U.S. at 837, 110 S.Ct. 1570. Justice Scalia, concurring in the result, wrote separately to state that the *Bradley* and *Bowen* were not merely in apparent tension, but in "irreconcilable contradiction." *Id.* at 841, 110 S.Ct. 1570 (Scalia, J., concurring). He reviewed the *Thorpe* and *Bradley* cases and determined that they had misinterpreted and misapplied Supreme Court precedent, including Chief Justice Marshall's opinion in *Schooner Peggy.* Justice Scalia noted that *Schooner Peggy* stood only for the proposition that when Congress

"plainly says" legislation has retroactive effect, the courts may depart from "the ordinary presumption which courts will 'struggle hard' to apply" against retroactivity. *Id.* at 846–47, 110 S.Ct. 1570.

**37.** The Court explicitly noted that this test would "leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483. Nonetheless, it observed that "retroactivity is a matter on which judges tend to have 'sound ... instinct[s].' " *Id.* (quoting *Danforth v. Groton Water Co.,* 178 Mass. 472, 476, 59 N.E. 1033 (1901) (Holmes, J.)).

characterized *Thorpe* as a case in which the "new hearing procedures did not affect either party's obligations," and held that "procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." *Landgraf,* 511 U.S. at 275–76, 114 S.Ct. 1483.

52. In addition to procedural rules, the Court also concluded cases seeking "prospective-relief" were not subject to the presumption against retroactivity. "When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* at 273, 94 S.Ct. 2006. The Court cited *American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921), as an example of this principle. *Id.* There, the Court held that a section of the Clayton Act, enacted while the case was pending on appeal, governed the propriety of injunctive relief against labor picketing. *Id.* at 201, 42 S.Ct. 72; *Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483. "[B]ecause relief by injunction operates *in futuro* and the right to it must be determined as of the time of the hearing, [the amendment] relating to injunctions was controlling in so far that decrees entered after its passage should conform to its provisions." *American Steel Foundries,* 257 U.S. at 201, 42 S.Ct. 72.

53. Finally, the Court created an exception for statutes "conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Landgraf,* 511 U.S. at 274, 114 S.Ct. 1483 (citing *Bruner v. United States,* 343 U.S. 112, 116–17, 72 S.Ct. 581, 96 L.Ed. 786 (1952)). The Court concluded such an exception was appropriate because "[a]pplication of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" *Id.*

(quoting *Hallowell v. Commons,* 239 U.S. 506, 508, 36 S.Ct. 202, 60 L.Ed. 409 (1916)).

54. The *Landgraf* Court summarized its holding as follows:

"When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.* at 280, 114 S.Ct. 1483.

55. The Ninth Circuit applied *Landgraf* to administrative regulations in *Covey. Covey* concerned the applicability of Department of Housing and Urban Development ("HUD") regulations that defined "housing for older persons" that was exempt from the Fair Housing Act's prohibition on familial status discrimination. *Covey,* 116 F.3d at 832–33. Under a rule promulgated in 1988, the exemption applied if a party adduced evidence of "the existence of significant facilities and services specifically designed to meet the physical or social needs of older persons." *Id.* at 832. Because "significant facilities and services" proved difficult to interpret and implement, HUD promulgated more specific guidelines in 1995. *Id.* at 833. Shortly after their implementation, a district court applied the 1995 regulations and

granted summary judgment for defendants in a case that had been filed in 1993. *Id.* at 834. Plaintiffs did not seek prospective relief and all the events at issue had occurred prior to the effective date of the 1995 HUD regulations. *Id.* at 835.

56. The Ninth Circuit held that "applying the 1995 regulations retroactively simply because [plaintiffs'] claim ha[d] not yet been reduced to a judicial determination of liability would gravely undermine the presumption against retroactivity." *Id.* at 837. Citing *Bradley*, defendants argued that the new regulations simply clarified HUD's prior definition of the "significant facilities and services" requirement. *Id.* The Ninth Circuit concluded, to the contrary, that the new regulations "substantially alter[ed] the standard" for determining whether a facility could gain an exemption and declined to apply it to the dispute at hand. *Id.*[38]

57. Applying *Landgraf* and its Ninth Circuit progeny to the interim rule at issue in this case, the court must "first determine whether the [FDIC] expressly stated its intent to apply the new [rule] retroactively or prospectively." *TwoRivers v. Lewis*, 174 F.3d 987, 993 (9th Cir.1999) (citing *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483). The court has concluded, as a matter of deference to the administrative agency that promulgated the regulation, that the FDIC did not expressly state its intent to apply the statute to accounts held at depository institutions that closed prior to September 26, 2008.

58. Given that there is no "clear language directing that [the court] apply the new statute retroactively," the court next [examines] whether the new statute would have retroactive effect." *Id.* (citing *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483). *Landgraf* identifies three factors that inform the court's decision in this regard: whether the regulation "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Covey*, 116 F.3d at 835 (quoting *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483). See also *Landgraf*, 511 U.S. at 269, 114 S.Ct. 1483 (" '[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective,' " quoting *Society for Propagation of the Gospel v. Wheeler*, 2 Gall. 105, 22 F.Cas. 756, 767 (No. 13,156) (C.C.N.H.1814) (Story, J.)); *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 947, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (describing each factor outlined in *Landgraf* and *Wheeler* as "a *sufficient*, rather than a *necessary*, condition for invoking the presumption against retroactivity" (emphasis original)).

59. Application of the new regulation to this case would unquestionably have retroactive effect. It would increase the FDIC's liability for past conduct, as the FDIC would be required to make a higher insurance payment based on a July 11, 2008 bank failure due to regulations promulgated on September 26, 2008. Because it "attaches a new disability," namely, a significantly increased level of insurance "in respect to transactions or consider-

---

**38.** The Ninth Circuit reached the same conclusion in *In re NOS Communications*, 495 F.3d 1052 (9th Cir.2007). There, plaintiffs had not been billed by defendant after Truth-in–Billing regulations were promulgated. The court concluded that they could not assert claims under the regulations, stating: "Nothing in the language indicates a clear congressional intent favoring retroactivity. In addition, the regulation imposes new duties with respect to transactions already completed." *Id.* at 1062.

ations already past [it] must be deemed retrospective." *Wheeler,* 22 F.Cas. at 767. See also *Covey,* 116 F.3d at 835 ("Cases involving settled contract and property rights, for example, require predictability and stability and are generally inappropriate candidates for retroactivity").[39]

60. "[I]f the court determines that the [regulation] operates retroactively, the traditional presumption in favor of prospectivity precludes application of the new [regulation] 'absent clear congressional [or regulatory] intent favoring such a result.'"

*TwoRivers,* 174 F.3d at 993 (quoting *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483). As in *Covey,* the court finds that the new regulations "substantially alter the standard" for determining the insurance coverage or revocable trust accounts. *Covey,* 116 F.3d at 837. Applying the new regulation simply because plaintiffs' claim "has not yet been reduced to a judicial determination ... would gravely undermine the presumption against retroactivity," particularly given the lack of a clear regulatory intent to the contrary.[40]

---

**39.** At oral argument, plaintiffs cited the *De-Gurules* factors that govern whether retroactive application will cause manifest injustice. *DeGurules,* 833 F.2d at 863 ("Whether a retroactive application will cause manifest injustice is ... turn determined by an assessment of three factors: (1) the nature and identity of the parties; (2) the nature of their rights; and (3) the nature of the impact of the change in law upon those rights"). The *DeGurules* court held that "[t]he fact that the party adversely affected by the new law is a governmental entity makes a finding of manifest injustice less likely." *Id.* (quoting *Campbell v. United States,* 809 F.2d 563, 575 (9th Cir. 1987)). Without deciding the continued vitality of *DeGurules* in light of the Supreme Court's later ruling in *Landgraf,* the court need not address whether retroactive application would cause manifest injustice, because the court has already found that the regulation does not have retroactive application.

**40.** At oral argument, plaintiffs argued that three policies articulated in *Landgraf* militate in favor of applying the new regulation retroactively. First, plaintiffs cited *Landgraf*'s invocation of elementary considerations of fairness. *Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted"). The Supreme Court concluded, however, that considerations of fairness justify a presumption *against* retroactivity, and not, as plaintiffs suggest, that they favor retroactive application. See also *Hernandez de Anderson v. Gonzales,* 497 F.3d 927, 935 (9th Cir.2007) (noting that *Landgraf*'s invocation of "elementary

considerations of fairness" justified a finding that "the legal effect of conduct should ordinarily be assessed under the law that existed when the *conduct* took place," and not according to the law that exists at the time the court reviews the conduct, quoting *Landgraf,* 511 U.S. at 264–65, 114 S.Ct. 1483); *Koch v. S.E.C.,* 177 F.3d 784, 785 (9th Cir.1999) ("elementary considerations of fairness" require a "clear statement" that legislation is to be applied retroactively).

Second, plaintiffs contended that there are many situations in which it is proper to apply new statutes or regulations enacted after the events that give rise to the cause of action. As discussed, *Landgraf* found retroactive application proper in three situations, none of which describes the circumstances in which plaintiffs find themselves.

Finally, plaintiffs asserted that retroactivity provisions "often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary." *Landgraf,* 511 U.S. at 267–68, 114 S.Ct. 1483. This is unquestionably true. Nonetheless, the next sentence of the *Landgraf* opinion states: "However, a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Id.* at 268, 114 S.Ct. 1483. Because the court concludes that the FDIC did not indicate an intention that the new regulation apply retroactively, this policy does not aid plaintiffs here.

## G. Whether FDIC's Application of the Prior Regulation Violates Due Process

61. In their reply, plaintiffs argue that the FDIC's action violates the Due Process Clause of the Fifth Amendment. Specifically, they assert that the prior regulation was so ambiguous and complex that it resulted in "multiple, conflicting interpretations by the public and FDIC trained bank employees."[41] Plaintiffs' support for this proposition is *Brandt v. Hickel,* 427 F.2d 53 (9th Cir.1970).

62. In *Brandt,* appellants, having been denied an application for an oil and gas lease, were advised by the Bureau of Land Management ("BLM") that they could either substitute their forms and reapply or appeal the decision. *Id.* at 55. After appellants reapplied, however, the Secretary of the Interior concluded: (1) that the amended application was an attempt to create a new offer, and so it was junior to offers that had been received before the second application; and (2) that by failing to appeal the initial determination, appellants had lost the right to assert the validity of the original offer. *Id.*

63. The Ninth Circuit held that the notice provided by the BLM did not satisfy due process because it failed to advise appellants that reapplying would have an adverse effect on the priority of their application, and because it was ambiguous as to whether it was a final decision. *Id.* at 56–57. The BLM's initial determination stated that "the subject offer is hereby held for rejection" and that "failure to submit a new offer form will result in the final rejection and closing of the case without further notice." *Id.* at 57. The Ninth Circuit concluded that these statements were subject to different interpretations and held that "due process [was] not satisfied by a decision which is subject to several constructions of an element of finality." *Id.*

64. It held that due process is violated when an agency gives "erroneous advice" that is "so closely connected to the basic fairness of the administrative decision making process that the government may be estopped from disavowing the misstatement." *Id.* at 56. See also *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 60–61 & n. 13, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) ("Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government," citing *Brandt,* 427 F.3d at 57); *United States v. Lazy FC Ranch,* 481 F.2d 985, 989 (9th Cir.1973) ("[E]stoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel").

65. Plaintiffs' reliance on *Brandt* fails. *Brandt* was premised on a "misstatement" by agency officials that rendered the notice provided to plaintiffs insufficient. Plaintiffs do not identify any misstatement in the Notice of Allowance of Claim that they received from the FDIC. Although that notice does not explicitly state that it

---

41. *Id.* at 5.

is a final agency action, it advises that if plaintiffs "have uninsured deposits, as established by the FDIC's Insurance determination, [plaintiffs] automatically have a claim for such a fund." It also notes that, "[i]n the event [plaintiffs] disagree with the FDIC's determination with respect to [their] uninsured deposits, [they] may seek review of the FDIC's determination" in district court.[42] The accompanying receivership certificate and oral explanation of the determination memorialized in the Depositor Interview Form[43] satisfy the court that plaintiffs received sufficient notice of the availability of a claim and the adverse effect of the agency's determination. It thus concludes that the FDIC's notice contained no misstatement or erroneous advice.

66. Plaintiffs do not contend that the regulation itself misstates or misrepresents the rule applicable to insurance determinations for revocable trust accounts. They merely assert that it was hard to understand, and that members of the public and FDIC-trained bank employees misconstrued it. Similarly, they do not contend

that the FDIC's effort to clarify and provide examples of the operation of the rule in Advisory Opinion FDIC–05–05 misrepresented the manner in which it operated. Consequently, the court concludes that *Brandt* provides no basis for estopping the FDIC from asserting and applying the prior regulation governing insurance for revocable trust accounts.[44]

## III. CONCLUSION

For the reasons stated, the court finds that plaintiffs are not entitled to recover further insurance for their revocable trust accounts from the FDIC.

---

42. AR, Exh. D.

43. *Id.*, Exhs. B, D.

44. In citing *Brandt*, the Henrys do not appear to challenge the constitutionality of the regulation itself. Under the Due Process Clause, "[a] rational relationship to a legitimate government interest will normally suffice to uphold [a] regulation." *Beller v. Middendorf,* 632 F.2d 788, 808 (9th Cir.1980), cert. denied, 454 U.S. 855, 102 S.Ct. 304, 70 L.Ed.2d 150 (1981). "In evaluating claims that a government action violates substantive due process, we do not sit as a super-legislature. The mere fact that we might not adopt a regulation if we were the policymakers is insufficient to hold such regulation unconstitutional under the due process clause." *Snaman v. Thornburgh,* 956 F.2d 275 (Table), 1992 WL

33924, *2 (9th Cir. Feb. 25, 1992) (Unpub.Disp.). Because the Henrys did not raise such a constitutional challenge, the FDIC has had no opportunity to argue whether the regulation has a rational relationship to a legitimate government interest. It is clear, however, that insuring the deposits of depository institutions while simultaneously setting limits on such insurance by establishing a maximum deposit insurance amount constitutes a legitimate government interest. Requiring the aggregation of deposits maintained by a depositor at a single institution, and limiting insurance for revocable trust accounts to certain categories of beneficiaries, appears to be rationally related to this interest. See *id.* (holding that "the particular method" is not rationally related to legitimate government interest if it is "clearly arbitrary and unreasonable").